Michael J. HOTH and Jeffrey R. Hoth, d/b/a Hoth Brothers, a Utah partnership, Plaintiffs,

v.

Karl R. WHITE and Amy H. White, husband and wife, Defendants.

Karl R. WHITE and Amy H. White, husband and wife, Third–Party Plaintiffs and Appellees,

v.

Dean R. MORGAN, Charles R. Team, Dean R. Morgan d/b/a Polar Bear Homes, and Charles R. Team d/b/a Team Realty, Third–Party Defendants and Appellants.

No. 880308–CA.

Court of Appeals of Utah.

Sept. 7, 1990.

Dale G. Siler (argued), Logan, for third-party defendants and appellants.

Kevin E. Kane (argued), Las Cruces, N.M., for defendants and third-party plaintiffs and appellees.

Before BENCH, GARFF and ORME, JJ.

## OPINION

GARFF, Judge:

Plaintiffs Michael J. Hoth and Jeffrey R. Hoth, d/b/a Hoth Brothers (the Hoths), filed a mechanic's lien against defendants, third-party plaintiffs, and appellees Karl R. and Amy H. White (the Whites), to enforce payment of their subcontract for framing a residence. The Whites responded and brought a third-party complaint against third-party defendants and appellants Dean R. Morgan, d/b/a Polar Bear Homes, and Charles R. Team, d/b/a Team Realty (collectively "appellants"), alleging that they, in their role as general contractor, had failed to pay sums due under the subcontract to the Hoths. The trial court ordered the Whites to pay the Hoths the amounts due under the subcontract and ordered appellants to indemnify the Whites. We affirm in part and reverse in part.

Morgan is the owner of Polar Bear Homes, a firm which specializes in building unique, energy efficient homes. The Hoths, Morgan's nephews, are framing subcontractors. Team is a real estate broker, the sole proprietor of Team Realty, and claims that he has no business relationship with Polar Bear Homes or Morgan other than a real estate brokerage contract.

Amy White contacted Polar Bear Homes to inquire as to the possibility of it building the Whites' new, custom house. Team was instrumental in showing her the merits of Polar Bear Homes by meeting with her several times and showing her some houses built by the company. Amy White testified that during these meetings Team identified himself as Morgan's partner, and that during one meeting he spoke to a radio commentator on the telephone in order to advertise Polar Bear Homes, identifying himself as being associated with that company. He gave her a business card upon which was imprinted a Polar Bear Homes logo and his name. Amy White assumed on the basis of this information that Team was Morgan's partner in Polar Bear Homes.

On August 26, 1986, the Whites met with Team and Morgan, and contracted with Polar Bear Homes to build a custom, energy efficient house according to plans and specifications drafted by Amy White and given to Morgan. The parties signed a standard earnest money agreement, Morgan signing on behalf of Polar Bear Homes, and Team receiving the $100 earnest money on behalf of Team Realty. Construction was to be completed by December 10, 1986. The contract required the Whites to supply construction financing of $40,000. Karl White requested that Morgan provide him with accountings, lien waivers, and copies of cancelled checks during the progress of the construction.

Soon after signing the earnest money agreement, Morgan subcontracted with the Hoths to frame the house for the price of $6,000. Morgan provided the Hoths with the plans but not with the specifications, which were listed on a separate sheet.

The Hoths began framing the house during the first week of October 1986, but did not complete their work until February 12, 1987, two months after the entire house was to have been completed. Many problems arose during construction which required changes to be made in the framing. Some of the required changes resulted from the improper pouring of the foundation, some from the Hoths' ignorance of some of the specifications, some because the plans were incomplete or unclear, and some because Amy White changed her mind as to what she wanted. Amy White was present on the job site nearly every day, and interacted frequently with the Hoths. Although the Hoths substantially

completed framing the house, they did not completely finish the job, making it necessary for the Whites to hire other subcontractors to come in and complete the work.

During the months of October and November 1986, the Whites made progress payments on the construction, but were not provided with any accounting of the funds spent. By January 1987, the Whites had already provided appellants with $43,000. Soon after January 3, 1987, Morgan acknowledged that there was at least a $10,000 overrun on the contract price, and asked the Whites to pay half of that. The Whites deferred making a decision on this request until the house was completed.

The Whites again demanded an accounting. Morgan provided a partial accounting on January 6, 1987. This accounting showed that Morgan had paid the Hoths $3,500 on the subcontract, leaving an unpaid balance of $2,500. It also indicated that Morgan had paid himself $3,007 and Team $2,000, which Morgan explained was an advance on Team's sales commission. The Whites refused to give Morgan any more money, but began paying the construction bills directly, and began to directly hire subcontractors to complete the building, bypassing Morgan. Morgan testified that he felt he had lost all control over the project, and had been taken off the job. The Whites, however, stated that they consistently requested him to return to the job and assume his responsibilities, especially with the numerous structural problems present. They concluded that they had to take over because the construction was substantially behind schedule, and Morgan was not paying the bills or otherwise doing his job.

On March 16, 1987, at Morgan's suggestion, the Hoths filed a mechanic's lien on the house, claiming the unpaid balance of $2,500 plus an additional $1,410 for extra work and material supplied by them beyond the scope of the initial subcontract. Their total claim was $3,910.

Morgan subsequently provided the Whites with three more accountings: one on April 10, 1987, one on June 11, 1987, and one on November 18, 1987. These accountings, although inconsistent with one another, indicated that Team had refunded his $2,000 payment made in January 1987, the Hoths had not been paid for the balance of their contract, and the total construction bills exceeded the total amount of payments made by the Whites. Morgan paid $1,227.94 of these costs out of his own funds, and he and Team were ultimately uncompensated for the project.

In September 1987, the Hoths filed this action to foreclose on their mechanic's lien. On September 25, 1987, the Whites answered and counterclaimed for substandard work, disputing the amount and character of the "extra" items which the Hoths had determined were not within the scope of the original subcontract. The Whites also filed a third-party complaint in which they sought indemnity from third-party defendants Morgan and Team. Trial was held in the matter on March 3, 4, 7, and 9, 1988.

Upon the conclusion of closing arguments, the trial court announced its ruling and instructed the Hoths' and Whites' attorneys to prepare appropriate findings of fact, conclusions of law, and judgments. The attorneys, accordingly, did so. On March 29, 1988, the court, on its own motion, requested that all three attorneys appear. At this conference, the court rejected the proposed findings of fact and conclusions of law, and issued its own findings of fact and conclusions of law.

The trial court found that the Whites were liable to pay the Hoths the remaining $2,500 balance on the original contract plus $1,009 of the "extras," less an offset of $516 for the costs the Whites had been required to pay to other subcontractors to finish the framing. It also ordered the Whites to pay the Hoths $1,000 in attorney fees, plus court costs to be determined from the record, for a net judgment of $3,993 plus costs. It then ordered appellants to indemnify the Whites in the amount of $2,993 and costs, plus pay $1,000 to the Whites for attorney fees. Appellants subsequently objected to the additional $1,000 in attorney fees payable to the Whites, alleging that it was a typographical error, but the court indicated that it

was not an error and reiterated its order for them to pay the attorney fees. The court also concluded that Team and Morgan had entered into a joint venture with respect to the Whites, so were jointly and severally liable to pay the judgment.

On May 12, 1988, appellants brought this appeal. The Whites cross-appealed. The court, on its own motion, consolidated the appeals. The parties raise the following issues on appeal. Appellants argue that the trial court improperly found them responsible for payment to the Hoths and payment of the Whites' attorney fees, alleging that the trial court erred in: (a) failing to find that appellants were discharged from performing the contract because (i) the Whites made their performance impossible through their constant interference, and (ii) the plans and specifications submitted by the Whites were inadequate; (b) finding that appellants breached the contract by making payments to themselves in January 1987 rather than paying off the Hoths' subcontract; (c) concluding that Team and Morgan were joint venturers; and (d) rejecting the more favorable findings of fact and conclusions of law prepared by the parties' attorneys and substituting its own. The Whites argue that the trial court abused its discretion in awarding them less than their requested amount of attorney fees.

## SUFFICIENCY OF THE EVIDENCE

While we accord no particular deference to the trial court's legal conclusions, *Grayson Roper Ltd. Partnership v. Finlinson,* 782 P.2d 467, 470 (Utah 1989), we will not set aside a trial court's factual findings unless they are against the clear weight of the evidence or we otherwise reach a definite and firm conviction that a mistake has been made. *Williams v. Miller,* 794 P.2d 23, 25–27 (Utah Ct.App.1990); *Grayson Roper Ltd. Partnership,* 782 P.2d at 470. A finding is clearly erroneous if it is without adequate evidentiary support or is induced by an erroneous view of the law. *Williams,* 794 P.2d at 25–27. We give due regard to the trial court's ability to observe the demeanor and judge the credibility of the witnesses. *Id.*

The burden on appellants of overturning factual findings is heavy because we do not sit to retry cases submitted on disputed facts. *Jarman v. Reagan Outdoor Advertising,* 794 P.2d 492, 494–95 (Utah Ct.App. 1990); *Saunders v. Sharp,* 793 P.2d 927, 931–32 (Utah Ct.App.1990). When challenging findings of fact on appeal, the appellant must show that the factual findings are clearly erroneous. *State v. Moosman,* 794 P.2d 474, 474 (Utah 1990). To show clear error, the appellant must marshal all the evidence supporting the trial court's factual findings and then demonstrate that the evidence, including all reasonable inferences drawn therefrom, is insufficient to support the findings. *Id.* We view the facts from the record in the light most favorable to the trial court's findings. *Id.; Saunders,* 793 P.2d at 931–32.

Because many of the issues raised in this case also involve the interpretation of the parties' construction contract, we reiterate that the cardinal rule in construing any contract is to give effect to the parties' intentions. *Atlas Corp. v. Clovis Nat'l Bank,* 737 P.2d 225, 229 (Utah 1987). These intentions are best determined by looking to the terms of the written agreement, if the agreement is complete and unambiguous. *Ron Case Roofing & Asphalt, Inc. v. Blomquist,* 773 P.2d 1382, 1385 (Utah 1989). In the absence of ambiguity, the construction of the document is a question of law, and the reviewing court is not bound by the trial court's determination. *Terry v. Price Mun. Corp.,* 784 P.2d 146, 149 (Utah 1989).

The trial court found that in January 1987, Morgan received $3,000 and Team $2,000 from the construction funds paid by the Whites, that neither Morgan nor Team were entitled to any money under the contract until the costs of construction had been satisfied, and that if these sums had been paid to the Hoths, their lien and, hence, this lawsuit would have been unnecessary. Therefore, the court concluded that appellants' receipt of money and con-

sequent failure to pay the Hoths constituted a breach of the contract.

The contract, entered into on August 26, 1986, indicated that the total purchase price for the residence was $142,250, of which the Whites were initially required to pay $40,000 for construction costs. The terms of the contract provided that the contractor would bring current on or before closing "all obligations against the property including taxes, assessments, mortgages, *liens* or other encumbrances of any nature." (Emphasis added.) The contract also provided that "[a]ll cash payments and advances provided directly by Buyer under this Agreement (other than EARNEST MONEY deposited with a real estate brokerage) shall be deposited, together with escrow instructions, with an escrow agent selected by Contractor.... The use of such deposits shall be limited to construction of the residence described in this Agreement."

■ The evidence is uncontroverted that Morgan did not pay the Hoths for the balance of their contract, and that the Whites conformed to the terms of the contract. The record also indicates that Morgan and Team took $5,000 of the construction funds for their own uses in January 1987. As to Morgan's assertion that he, as a contractor, was also entitled to periodic payments under the contract, there are no clear terms in the contract which give him this right. We will not rewrite a contract to alleviate a contracting party's mistake, but will construe it according to its terms as written. *Heiner v. S.J. Groves & Sons*, 790 P.2d 107, 110 (Utah Ct.App.1990). Because Morgan was not entitled under the contract to take funds for purposes other than the construction of the home, and because he did so at the apparent expense of the Hoths, we find that Morgan breached the contract. Therefore, we conclude that the trial court did not err in finding that appellants breached the contract and, thus, are liable to pay the balance of the subcontract, $2,500, to the Hoths.

Appellants allege that they should have been excused from performance under the contract because of the Whites' continual and constant interference with the construction, culminating in their taking the job away from Morgan and making it impossible for him to perform. The Whites deny this, stating that Morgan had required them to be involved in the construction from the start, and that he ultimately failed to perform his duties to the point that they had to step in and take over to get the job done. Evidence in the record supports both parties' contentions, but the trial court made no findings on this issue. Although findings should be made on all material subordinate and ultimate factual issues, the court need not resolve all conflicting evidentiary issues or negate all allegations in its factual findings. *Sorenson v. Beers*, 614 P.2d 159, 160 (Utah 1980). Because the court found that appellants breached the contract on other grounds, its failure to make findings on this issue is not error. It implicitly found against appellants on this issue.

*Authorization of "extras"*

The trial court found that either the Whites or appellants ordered certain extras, that some of the "extras" came about as a result of lack of detail in the plans, and that the Hoths were entitled to compensation for them in the amount of $1,009. It also found that, although the Hoths had substantially completed the contract, they had failed to complete a portion of it, requiring the Whites to obtain labor from other sources at a cost of $516, which the court offset against the Hoth's compensation.

■ As the trial court found, the record indicates that a substantial number of the extras came about as a result of requests by Amy White, although several were requested by Morgan. Viewing the evidence in the light most favorable to the findings, the record suggests that many of the changes requested by the Whites were made to bring the residence into conformance with the specifications, which the Whites gave to Morgan but were not transmitted by Morgan to the Hoths, and because mistakes were made in pouring the

foundation which resulted in problems which the extras were designed to correct.

Relevant contract terms provide that "[t]he amount of the purchase price may be increased if additional costs are incurred for extras as described hereafter. Buyer agrees to pay for the cost of all such extras as agreed to in a written change order as part of the purchase price of the property," and "[n]o changes shall be made to the Plans and Specifications or the purchase price except as agreed to in a written change order signed by Buyer and Contractor which sets forth the change to be made and the amount of adjustment in the purchase price required by said change." The contract thus clearly provides that unless there is a written change order signed by the parties for each extra, the purchase price is not to be increased and the buyer, therefore, is not responsible for paying for the extra. It is undisputed that the parties signed no such written change orders.

We find that the trial court did not err in requiring appellants to pay that portion of the extras not paid for by the Whites.

As to appellants' strange assertion that the court should not draft its own findings, rule 52(a) of the Utah Rules of Civil Procedure gives the court the responsibility of finding the facts and stating its conclusions of law and judgment. *See Boyer Co. v. Lignell,* 567 P.2d 1112, 1113-4 (Utah 1977). The court may ask the prevailing counsel to submit findings to aid the court in making these necessary findings. *Id.* at 1113. However, the court should not "mechanically adopt" these findings. *Id.* The trial court thus has the ultimate discretion in determining the findings of fact and conclusions of law. Therefore, we find appellants' contention that the trial court erred by substituting its own findings for those prepared by counsel to be totally without merit.

### PARTNERSHIP

Appellants assert that the trial court erred in concluding that Team and Morgan were joint venturers. They argue that there was no evidence of co-ownership or any intention to share in the profits, so no joint venture existed. The Whites, however, assert that Team represented to them that he was Morgan's partner, and that his involvement in the project was beyond that of a real estate agent.

Utah Code Ann. § 48-1-3.1 (1989) defines a joint venture as "an association of two or more persons to carry on as co-owners of a single business enterprise," and provides that joint ventures are governed by the partnership act. In the event that an association of persons is found to be a joint venture, all partners to the joint venture are, therefore, liable "jointly and severally for everything chargeable to the [joint venture] under Sections 48-1-10 and 48-1-11." Utah Code Ann. § 48-1-12 (1989). These chargeable acts include "any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership," and any loss occurring "where one partner acting within the scope of his apparent authority receives money or property of a third person and misapplies it." Utah Code Ann. §§ 48-1-10 and 48-1-11 (1989). Therefore, if the trial court properly found Morgan and Team to be involved in a joint venture, it properly found them to be jointly and severally liable to pay the judgment.

In determining whether a partnership or joint venture exists under the Partnership Act, certain rules apply:

(1) Except as provided by Section 48-1-13, persons who are not partners as to each other are not partners as to third persons.

. . . .

(3) The sharing of gross returns does not of itself establish a partnership, whether or not the persons sharing them have a joint or common right or interest in any property from which the returns are derived.

(4) The receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment: (a) As a debt by installments or otherwise.

Utah Code Ann. § 48-1-4 (1989). While Morgan and Team shared in the gross returns of the construction of the Whites' residence due to the January 1987 disbursements, this fact does not, under subsection (3), establish that they were engaged in a joint venture. However, viewing the evidence in the light most favorable to the trial court's findings, the $2,000 received by Team was a share of profits and is prima facie evidence that he was, indeed, a joint venturer under subsection (4).

Team and Morgan testified that they were not partners as to each other and, thus, maintain that, under subsection (1), they are not partners as to the Whites. Utah Code Ann. § 48-1-13 (1989) states that

> [w]hen a person by words spoken or written or by conduct represents himself ... to anyone as a partner, in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made who has on the faith of such representation given credit to the actual or apparent partnership.

Despite Team's testimony to the contrary, the Whites testified that Team had told them he was Morgan's partner; had met with them, together with Morgan, several times, and had gone beyond their normal expectation of a real estate agent's activities by assisting with the ordering of materials for the job site. Although this evidence is controverted, we defer to the trial judge's opportunity to view the demeanor of the witnesses, and view the evidence in the light most favorable to his factual findings. This testimony, indicating that Team represented himself to the Whites as Morgan's partner, provides sufficient evidence to find him liable as a partner to the Whites under section 48-1-13. *See Buehner Block Co. v. Glezos,* 6 Utah 2d 226, 310 P.2d 517, 520-21 (1957) (partnership liability to mechanics' lienors was found where the defendant had stated to others that he was or intended to become another's partner, and where he paid for a part of the material used and was present during the delivery and use of construction

materials on the premises). We, therefore, affirm the trial court on this issue.

## ATTORNEY FEES

Appellants assert that the trial court abused its discretion by assessing the Hoths' attorney fees against them, as part of its indemnification award, because the Whites should have paid the balance of the subcontract in the first place. Instead, they argue that the trial court should have allowed them to recover reasonable costs and attorney fees for the four day trial and in bringing this appeal. In their cross-appeal, the Whites assert that the trial court erred in awarding them only $1,000 in attorney fees, and request attorney fees on appeal.

■ It is well settled that a reasonable attorney's fee may be awarded under Utah Code Ann. § 38-1-18 (1988), the applicable portion of the Mechanics' Liens Act, in an amount fixed by the court. Therefore, the trial court may properly award attorney fees to the Hoths. The trial court found, and we affirm, that appellants were ultimately responsible for payment of the Hoths' claim under their mechanics' lien, so we, likewise, affirm the trial court's award of $1,000 to the Hoths for attorney fees, assessed against appellants.

It is also well settled that the trial court may award attorney fees if they are provided for under an enforceable contract provision and the award is consistent with the terms of the contract. *Dixie State Bank v. Bracken,* 764 P.2d 985, 988 (Utah 1988); *Regional Sales Agency, Inc. v. Reichert,* 784 P.2d 1210, 1214-15 (Utah Ct.App.1989). Such an award is a matter of legal right, but must be reasonable and must be supported by adequate evidence. *Saunders v. Sharp,* 793 P.2d 927, 931-32 (Utah Ct.App. 1990); *Ringwood v. Foreign Auto Works, Inc.,* 786 P.2d 1350, 1361 (Utah Ct.App. 1990) *cert. denied,* 795 P.2d 1138 (Utah 1990).

■ The parties' contract provides that "should either party default in any of the covenants or agreements herein contained, the defaulting party shall pay all costs and expenses, including a reasonable attorney's

fee, which may arise or accrue from enforcing or terminating this Agreement or in pursuing any remedy provided hereunder or by applicable law...." The trial court has determined, and we have affirmed, that appellants breached the contract by failing to pay the Hoths and that this action would not have been brought, apart from this breach. Because the Whites successfully pursued their contract remedies in this action, the trial court properly awarded attorney fees to the Whites.

"An award of attorney's fees must be based upon evidence in the record which supports the award." *Regional Sales Agency, Inc.*, 784 P.2d at 1215. A court need not award the entire amount requested, but must evaluate the requested fees to determine if a lesser amount is reasonable under the circumstances. *Id.* Factors which it may consider in making this determination include:

> the difficulty of the litigation, the efficiency of the attorneys in presenting the case, the fee customarily charged in the locality for similar services, the amount involved in the case and the result attained, and the expertise and experience of the attorneys involved.

*Id.* (quoting *Cabrera v. Cottrell*, 694 P.2d 622, 625 (Utah 1985)); *see also Dixie State Bank v. Bracken*, 764 P.2d 985, 989–90 (Utah 1988). Trial courts should make findings which explain the factors which they consider relevant in making an attorney fee award, especially when they reduce the amount from that requested. *Regional Sales Agency, Inc.*, 784 P.2d at 1215. "Where the evidence supporting the reasonableness of requested attorney fees is both adequate and entirely undisputed, the court abuses its discretion in awarding less than the amount requested unless the reduction is warranted by one or more of the factors described in *Dixie State Bank v. Bracken*, 764 P.2d 985, 987–91 (Utah 1988). *Martindale v. Adams*, 777 P.2d 514, 517–18 (Utah Ct.App.1989). These factors include (a) the legal work actually performed, (b) the reasonable necessity of the legal work to adequately prosecute the matter, (c) the consistency of the attorney's billing with the rates customarily charged in the locality for similar services, and (d) any

circumstances requiring the consideration of other factors, such as those listed in the Code of Professional Responsibility. *Dixie State Bank*, 764 P.2d at 990.

Here, the Whites testified that they were charged an hourly rate of $75 per hour and that there had been 22.63 hours of attorney time put into negotiations, preparation of pleadings and discovery, and in preparation for trial, including the first day of trial. Their attorney submitted an uncontested affidavit itemizing the hours worked and stating that the amount charged was reasonable in the community. The total bill through the first day of trial was $2,879.25. The succeeding three days of trial incurred an additional sixteen hours which were not included in the itemization. The trial court only awarded the Whites $1,000 for attorney fees.

Although the evidence establishing the fees was uncontroverted, the trial court, in its oral findings, stated:

> As to attorney fees, the Court sat here very patiently, I guess I lost my patience a couple of times; it appeared to the Court that this is a case that could have been tried in one day if the parties used discovery and all the rules pertaining thereto, and in view of the fact that Rule 1 of the Utah Rules of Procedure say that these rules shall be liberally construed to secure the just, speedy and inexpensive determination of every action. [sic] The Court just cannot allow that much attorney's fees, and the Court's going to limit your allowance to a total of $1,000, which includes any allowance for Mr. Low in preparing the lien and recording it.

The trial court evidently found that the attorneys failed to make use of appropriate pre-trial discovery procedures, and were inefficient in presenting what should have been a relatively simple case. Accordingly, it reduced the attorney fee award. Although we defer to the trial court's advantaged perspective as to the efficiency of the trial process, we find no justification for its reduction of the attorney fee award to $1,000 when the uncontroverted evidence indicated that a reasonable fee through the first day of trial, which even the court regarded as necessary, was $2,879.25. We

also note that pre-trial discovery incurs considerable expense, and although trial days might have been saved, we are left to wonder how much further expense would have been incurred had the range of discovery measures been pursued.

Be that as it may, the record shows the Whites were minimally entitled to recover from appellants attorney fees in the amount of $2,879.25 and we remand with instructions to revise the judgment accordingly. *See generally Martindale v. Adams,* 777 P.2d 514, 517–18 (Utah Ct.App. 1989); *South Sanpitch Co. v. Pack,* 765 P.2d 1279, 1282–83 (Utah Ct.App.1988).

The Whites having prevailed on appeal, they are also entitled to an award of reasonable attorney fees incurred on appeal. *See, e.g., Management Serv. Corp. v. Development Assocs.,* 617 P.2d 406, 408–09 (Utah 1980). We, therefore, also remand to the trial court for determination of that amount.

BENCH, J., concurs.

ORME, Judge (concurring in the result in part):

I concur in the court's opinion, except for the discussion under the heading "Authorization of extras," as to which I concur in the result only.