852 P.2d 1030 (1993)
ANESTHESIOLOGISTS ASSOCIATES OF OGDEN, A Utah Professional Corporation, Plaintiff, Appellant, and Cross-Appellee,
v.
ST. BENEDICT'S HOSPITAL, a Utah non-profit corporation, and St. Benedict's Health System, a Utah non-profit corporation, Defendants, Appellees, and Cross-Appellants.
No. 910368-CA.
Court of Appeals of Utah.
May 7, 1993.
*1032 D. Gary Christian and Shawn McGarry, Salt Lake City, for appellant and cross-appellee.
Stewart M. Hanson, Jr., Charles P. Sampson, Paul M. Simmons, and Lawrence R. Dingivan, Salt Lake City, for appellees and cross-appellants.
Before BENCH, JACKSON and ORME, JJ.
ORME, Judge:
In this contract dispute, Anesthesiologists Associates appeals the amount of damages awarded by the trial court and the court's denial of prejudgment interest, while St. Benedict's Hospital and its parent corporation (collectively referred to as "the Hospital") appeal the court's ruling that it breached the contract in the first place. We affirm in part, reverse in part, and remand.

*1033 FACTS
In 1954 Dr. Garr Merrill began providing anesthesia services at St. Benedict's Hospital. Dr. Milton Wilcox joined Dr. Merrill in 1955, and, in 1968, Drs. Merrill and Wilcox incorporated as Anesthesiologists Associates of Ogden ("Associates"). Associates hired Drs. Michael Crosby and David Morris in 1979 and 1980, respectively. Since 1955, Associates, or its physician predecessors, provided general surgical and emergency (but not general) obstetrical anesthesia services at St. Benedict's Hospital.
According to testimony during the liability phase of trial, in early 1980 the Hospital wanted to provide general obstetrical services for its patients in order to maintain its competitiveness in the health care market. For a number of reasons, including lack of formal training in that specialty area, Associates was reluctant to provide general obstetrical anesthesia services. On April 3, 1981, Associates entered into an agreement ("the Surgical Agreement") with St. Benedict's Hospital to provide surgical anesthesia services. The Surgical Agreement provided that Associates would not render general obstetrical anesthesia services, but would provide emergency obstetrical anesthesia services and anesthesia for caesarian section surgery. The Surgical Agreement's three-year term was to run through 1984.
In accordance with the Hospital's desire to have one physician group providing both surgical and obstetrical anesthesia services, the parties continued negotiations and, on November 17, 1981, signed an agreement ("the Obstetrical Agreement") whereby Associates would also provide general obstetrical anesthesia services. The Obstetrical Agreement provided, in relevant part:
1. Service Coverage. Associates will provide to Hospital's patients obstetrical anesthesia services on a seven (7) day per week, twenty-four (24) hour per day, basis pursuant to the terms and conditions of this agreement which is independent of and separate from a contract between the parties dated April 3, 1981, or any other agreements or understanding between the parties.
Full coverage for obstetrical anesthesia shall consist of one anesthesiologist and one "on call" nurse anesthetist. It will consist of (1) epidural block for elective deliveries and (2) emergency obstetrical anesthesia (Caesarian Section). Associates shall have the exclusive right to determine who will or will not participate in obstetrical anesthesia coverage.
....
3. Term. The term of this contract will be six (6) years from the date hereof. Associates shall have first right of refusal for renewal of this agreement for an additional six (6) year term from the date hereof. If Associates desire to renew this agreement for an additional six (6) years at that time, they shall notify Hospital in writing of their intention to do so.
4. Amendment of Existing Contract. As partial consideration for this contract, the parties agree that the agreement between them for Anesthesia Services dated April 3, 1981, shall be amended to provide that the term of that agreement shall [be] concurrent with the term of this agreement.
5. Computation of Term. For purposes of determining the six (6) year time period for this contract and the April 3, 1981, contract, the terms shall be deemed to commence at the time that Associates obtained the services of two (2) additional anesthesiologists of Associates' choice. However, if the parties subsequently agree, the computation of the term of the contract may be deemed to commence when one (1) additional anesthesiologist is employed by Associates. All reasonable efforts shall be made by the parties to obtain the additional anesthesiologist(s). In any event, the date for commencement of computation of the term of this contract shall be not later than August 31, 1982.
....
8. Liquidated Payment for Unilateral Early Termination. If Hospital desires to unilaterally terminate this agreement, it may do so by paying Associates One Hundred Thirty-Five Thousand Dollars *1034 ($135,000) for each year or portion thereof that this contract would have been in effect according to its original term, but only until two (2) of the Anesthesiologists Associates have either retired from full time practice, obtained other employment or have died.
9. Termination by Associates. This contract shall remain in full force and effect unless terminated by Associates by giving six (6) months written notice to Hospital of its intention to terminate or upon expiration as provided in paragraph 3 above.
10. Additional Service. If a Certified Registered Nurse Anesthetist (CRNA) employee of Associates is required to return to the Hospital for performance of services under this agreement on the anesthetist's call night, Hospital will pay Associates on a monthly basis, Fifty Dollars ($50.00) for each requirement therefor. The Anesthetist on duty shall determine whether or not there is a requirement for the assistance of the on-call CRNA.
In order to provide obstetrical services, Associates hired Dr. Rudolf Madlang on October 2, 1982, and Dr. Richard Rivera in January 1983. The trial court found that the term of the Surgical Agreement, as extended by the Obstetrical Agreement, commenced on October 2, 1982, as did the term of the Obstetrical Agreement.
On July 16, 1985, Associates notified the Hospital that it intended to terminate the Obstetrical Agreement effective January 16, 1986, pursuant to paragraph nine of that agreement. In response, one month later, the Hospital notified Associates that pursuant to paragraph four of the Obstetrical Agreement, the Surgical Agreement would terminate on January 16, 1986, along with the Obstetrical Agreement. Associates then attempted to rescind its notice of termination regarding the Obstetrical Agreement, but the Hospital refused and terminated both agreements on January 16, 1986.
After the termination, three of the physician-shareholders, Drs. Morris, Madlang, and Rivera, found employment earning more than they would have made during the remaining period of the agreements with the Hospital. Dr. Crosby, who struggled with a substance abuse problem, earned less in alternative employment than he would have made for the remaining period under the agreements. Dr. Merrill voluntarily retired from practice for reasons unrelated to the termination of the agreements. Dr. Wilcox retired after termination of the agreements even though he would have continued working had Associates continued its relationship with the Hospital.
Associates sued the Hospital for breach of the Surgical Agreement. The parties stipulated that the only issue for the liability phase of a bifurcated trial would be the intent of the parties with respect to the term provisions of the Obstetrical and Surgical Agreement. The trial court ruled the pertinent provisions of the Obstetrical Agreement were ambiguous. Based on the extrinsic evidence it heard, the court decided that the parties intended the Obstetrical Agreement to amend the Surgical Agreement such that both agreements were to have a six-year term commencing on October 2, 1982. The court further concluded the parties intended that early termination of the Obstetrical Agreement would have no effect on the continuation of the Surgical Agreement. During the damages phase of the trial, the court concluded Associates sustained $14,883 in damage, an amount equal to the lost net corporate profits for the remaining term of the Surgical Agreement. The trial court denied Associates' Motion to Amend the Memorandum Decision to include "call-back" damages in conjunction with Associates' use of nurse anesthetists under paragraph ten of the Obstetrical Agreement.
The Hospital appeals the trial court's determination of liability, in particular its conclusion that the terms of the Obstetrical Agreement were ambiguous. Associates appeals the calculation of damages, asserting the trial court erred in: (1) deducting compensation paid to the professional corporation's shareholders in determining lost profits, (2) making alternative findings that *1035 none of the individual physicians suffered damages, (3) declining to award damages under the "call-back" provision, and (4) denying Associates' claim for prejudgment interest.

AMBIGUITY
Whether the terms of a contract are ambiguous is a question of law; this court reviews the trial court's conclusion under a correctness standard. Fitzgerald v. Corbett, 793 P.2d 356, 358 (Utah 1990); Kimball v. Campbell, 699 P.2d 714, 716 (Utah 1985). In order to interpret a contract, we first look to the four corners of the document to determine the intent of the parties. Ron Case Roofing & Asphalt Paving, Inc. v. Blomquist, 773 P.2d 1382, 1385 (Utah 1989). Contract language is ambiguous only "if the words used to express the intent of the parties are insufficient so that the contract may be understood to reach two or more plausible meanings." Larson v. Overland Thrift & Loan, 818 P.2d 1316, 1319 (Utah App.1991), cert. denied, 832 P.2d 476 (Utah 1992). If contract is ambiguous, extrinsic evidence should be considered to determine the parties' intent, and "[q]uestions of intent as determined by extrinsic evidence are questions of fact ... and are subject to the `clearly erroneous' standard of review." Fitzgerald, 793 P.2d at 358. With these principles in mind, we first examine the threshold issue of whether the Obstetrical Agreement is ambiguous.
The trial court correctly noted that the central issues in the liability phase of the trial concerned the interpretation of various terms in the two agreements and whether termination of the Obstetrical Agreement also terminated the Surgical Agreement. If Associates' cancellation of the Obstetrical Agreement automatically terminated the Surgical Agreement, the Hospital did not breach the Surgical Agreement in notifying Associates of that agreement's termination. In its cross-appeal, the Hospital argues that its cancellation of the Surgical Agreement was not a breach because the term "concurrent" in paragraph four of the Obstetrical Agreement was unambiguous, meaning both agreements ran together, and when one agreement ended so did the other.
With regard to the legal determination of ambiguity, the disagreement over the use of the word "concurrent" in paragraph four must be viewed in the context of the entire contract. Several other provisions of the Obstetrical Agreement provide insight into the meaning of "concurrent" in this context. While paragraph one states that the two agreements are independent and separate, paragraph four, the major paragraph in dispute, melded the two agreements somewhat. Paragraph four provided that "[a]s partial consideration for this [Obstetrical] contract, the parties agree" to amend the Surgical Agreement so the term of the Surgical Agreement "shall be concurrent with the term of this [Obstetrical] agreement." The Obstetrical Agreement further diminished the independence and separateness of the two agreements in paragraph five, wherein it provided that "[f]or purposes of determining the six (6) year time period for this contract and the April 3, 1981, contract [the Surgical Agreement], the term shall be deemed to commence at the time that Associates obtained the services of two (2) additional anesthesiologists." Finally, paragraph eight provided that the Hospital would pay liquidated damages if it unilaterally terminated the Obstetrical Agreement, while paragraph nine required Associates to provide six months notice of its intention to terminate the contract. These latter two provisions are in stark contrast with the Surgical Agreement, which contained no provision for termination before the expiration of its stated three-year term. It is significant that paragraphs eight and nine referred only to termination of the Obstetrical Agreement, with no mention of the "independent" Surgical Agreement.
The trial court concluded that the contract was susceptible to three possible interpretations. The court explained:[1]

*1036 1. The Obstetrical Agreement extended the Surgical Agreement to a six (6) year term to commence at the same time as the Obstetrical Agreement and to be "concurrent" to the extent that they would run together, however, the termination of the Obstetrical Agreement pursuant to paragraphs 8 or 9 would not terminate the Surgical Agreement. (Plaintiff's position)
2. Both contracts would start and stop at the same time. Either party could terminate at any time pursuant to paragraphs 8 and 9 and both contracts would be terminated. (I thought this was defendant's position until defendant made his closing argument.)
3. The agreements would be "concurrent" in that the Surgical Agreement would merge into the Obstetrical Agreement and the termination of the Obstetrical Agreement would terminate the Surgical Agreement only if the termination was after the three (3) year term of the Surgical Agreement. (Defendant's position at the end of the trial.)
The Obstetrical Agreement supports, to varying degrees, each of these interpretations. The four corners of the agreement demonstrate only that the parties wanted the two agreements to remain separate in most respects, but to overlap to some limited extent with regard to duration and termination. Without exploring the merit of each interpretation, we believe the contract does not clearly express the intent of the parties with respect to the term and termination of each of the two agreements and that "the contract may be understood to reach two or more plausible meanings." Larson, 818 P.2d at 1319. The contract is therefore ambiguous as a matter of law.
In a case like the one before us, where "the document appears to incompletely express the parties' agreement or... is ambiguous in expressing that agreement," the trial court may rely on extrinsic evidence to determine the intent of the parties with respect to disputed terms. Ron Case Roofing, 773 P.2d at 1385. At trial, the court in the present case listened to extensive testimony from both sides concerning the meaning of the disputed provisions in the Obstetrical Agreement, particularly the word "concurrent" in paragraph four of the Obstetrical Agreement. After reviewing the evidence, the court found the plaintiff's interpretation best reflected the intent of the parties and therefore concluded that defendant breached the Surgical Agreement by cancelling it. We need not review the evidence supporting the trial court's interpretation of the ambiguous terms in any great detail.[2] nor must we decide whether the court reached what we consider the correct result. Wilburn v. Interstate Elec., 748 P.2d 582, 586 (Utah App.1988), cert. dismissed, 774 P.2d 1149 (Utah 1989). Because we conclude the trial court's factual findings in favor of Associates' interpretation are not clearly erroneous, we must defer to those findings. Accordingly, we affirm the trial court's resulting conclusion that the hospital breached the Surgical Agreement and move to the issue of damages.

MEASURE OF DAMAGES

A. The Role of Compensation Paid to Principals
Courts generally measure contract damages by the lost benefit of the bargain, and accordingly, "[d]amages are properly measured by the amount necessary to place the nonbreaching party in as good a position as if the contract had been performed." Alexander v. Brown, 646 P.2d 692, 695 (Utah 1982). Specifically, damages resulting from a breach of contract are usually calculated as "the amount plaintiff would have received had the contract been completed less the expenses plaintiff saved by not having to perform." John Call Eng'g, Inc. v. Manti City Corp., 795 P.2d 678, 681 (Utah App.1990). These *1037 general rules supply a framework for the parties' specific arguments that follow.
Associates argues that the trial court erred in calculating its damages by deducting from corporate income compensation paid to the physician-shareholders. Instead, Associates asserts that, unlike with a typical corporation, compensation paid to principals of a professional corporation should not be deducted from corporate income in calculating net profits. This issue is one of first impression in this state. We grant no deference to the trial court's legal conclusion and review that conclusion for correctness. See Stewart v. Coffman, 748 P.2d 579, 580-81 (Utah App.), cert. granted, 765 P.2d 1277 (Utah 1988), cert. dismissed, August 19, 1988 (unpublished order).
The distinctive professional corporation arose in response to the traditional rule prohibiting professionals from practicing in the regular corporate form. Such a form was viewed as conflicting with the exquisitely personal nature of the relationship between professional and client. 18B Am. Jur.2d Corporations § 2120 (1983). States enacted professional corporation statutes so that professionals, who had been forced previously to self employ, could take advantage of the corporate form, especially with respect to limited personal liability and tax advantages related to pension plans. J.F. Rydstrom, Practice by Attorneys and Physicians as Corporate Entities or Associations Under Professional Service Corporation Statutes, 4 A.L.R.3d 383 (1965). Utah's Professional Corporation Act reflects this purpose:
This act shall be so construed as to effectuate its general purpose of making available to professional persons the benefits of the corporate form for the business aspects of their practices while preserving the established professional aspects of the personal relationship between the professional person and those he serves.
Utah Code Ann. § 16-11-3 (1991).
This court has consistently recognized that professional corporations are unique business entities created to enable professionals to practice together and enjoy tax and certain other advantages of a corporate form and should not, therefore, necessarily be treated as ordinary corporations in all contexts. See, e.g., Sorensen v. Sorensen, 769 P.2d 820, 826 (Utah App.1989) (goodwill of a professional corporation is subject to distribution as a marital asset), rev'd, 839 P.2d 774 (Utah 1992); Riche v. North Ogden Prof. Corp., 763 P.2d 1210, 1213 & n. 5 (Utah App.1988) (where professional corporation stock was involuntarily transferred to nonprofessional, and articles of incorporation did not provide mechanism for repurchase, liquidation of corporation was proper), aff'd, 784 P.2d 1126 (Utah 1989); Stewart v. Coffman, 748 P.2d 579, 581 (Utah App.) (shareholder in professional corporation is not vicariously liable for malpractice of other shareholders unless personally involved), cert. granted, 765 P.2d 1277 (Utah 1988), cert. dismissed, August 19, 1988 (unpublished order). Our analysis proceeds with this statutory and jurisprudential scheme in mind.
Although no Utah cases address the way courts should treat compensation paid to principals in assessing a professional corporation's damages when it is denied the opportunity to perform a contract for the rendition of professional services, each party relies on primarily one case from another jurisdiction to support its argument.
The Hospital relies upon Southern Bell Telephone & Telegraph Co. v. Kaminester, 400 So.2d 804 (Fla.Dist.Ct.App.1981), which held that a physician-officer's salary is a corporate expense and must be deducted in calculating net profit when assessing damages incurred by a professional corporation from a breach of contract. Id. at 807. The Southern Bell court's reasoning rests largely upon the premise that one who benefits from the advantages of a corporate form cannot later jettison that form because it would be economically advantageous to do so. Id. Notwithstanding Southern Bell's seductive moral consistency, we believe its reasoning fails to recognize the hybrid nature of professional corporations.[3]
*1038 Associates relies upon Bettius & Sanderson, P.C. v. National Union Fire Insurance Co., 839 F.2d 1009 (4th Cir.1988), for support.[4] In Bettius, the plaintiff, a Virginia professional corporation engaged in the practice of law, sued its insurer after the insurer-defendant did not timely pay an amount required to satisfy a judgment in a fraudulent misrepresentation suit. Id. 839 F.2d at 1010-11. The plaintiff incurred further damages as a result of the untimely payment, which eventually led to dissolution of the corporation. In calculating damages for breach of contract, the trial court admitted evidence of compensation paid to the professional corporation's principals as evidence of corporate expenses and not as evidence of income in the calculation of net profits. See id. at 1012. The Court of Appeals for the Fourth Circuit reversed the trial court on this issue, holding that it would be unfair to force a professional corporation "to use the same formula as a commercial corporation if that formula does not accurately or adequately reflect its profits," and therefore compensation paid to the professional corporation's principals is relevant evidence of actual profit and not merely an expense which will reduce the net profit otherwise recoverable. Id. at 1014.
The Bettius court correctly relied upon the substantial differences between professional corporations and business corporations to arrive at its conclusion. Utah law reflects the same differences as does the Virginia law at issue in Bettius. Utah's Professional Corporation Act requires that all officers, directors, and shareholders be "duly licensed to render the same specific professional services as those for which the corporation was organized."[5] Utah Code Ann. § 16-11-8 (1991). Unlike a business corporation, where shareholders own stock in the organization and employees are hired and their salaries deducted as corporate expenses, employees and shareholders are largely one and the same in a professional corporation. Bettius, 839 F.2d at 1013. Consequently, whereas shareholders in a business corporation generally receive income through dividends produced by their investment in the corporation, shareholders in a professional corporation receive income chiefly by providing the professional services for which they are licensed. Id.
Because of these fundamental structural differences, professional corporations "calculate their net incomes with different goals in mind" when compared to business corporations. Id. While business corporations pay employees as an expense and generate net profit in order to distribute dividends and create capital, professional corporations primarily pay employee-shareholders based on professional services they provide. Thus, a professional corporation functions essentially as a partnership in which professionals earn their salaries providing professional services while taking advantage of the corporate form in largely incidental ways. A professional corporation distributes virtually all of its income as salaries to its shareholders and thus avoids the double-taxation scenario, where the corporation pays tax on its income and shareholders pay tax on their dividends. Because *1039 virtually all income is paid in salaries, a professional "corporation's net income for tax purposes is almost always at or near zero." Id. at 1013. Nonetheless, "it is unrealistic to suggest that the corporation is not earning a profit." Id. Merely because the legislature allowed professionals to participate in corporate advantages, one cannot conclude "that in an action to recover lost profits the professional corporation must also prove damages in the same manner as any other corporation and end up in almost every case with little or no recovery." Id. at 1013-14.
We agree with the Bettius court and hold that for purposes of determining a professional corporation's damages in cases like the instant one, compensation that would have been paid to the corporation's principals had a contract been performed should be considered as income in calculating lost profit, not as an expense of the corporation that was avoided by a contract's breach.[6]

B. Calculating Total Damages
Contract damages are awarded in order to "place the nonbreaching party in as good a position as if the contract had been performed." Alexander v. Brown, 646 P.2d 692, 695 (Utah 1982). According to the doctrine of avoidable consequences, however, the nonbreaching party "may not, either by action or inaction, aggravate the injury occasioned by the breach, but ha[s] a duty actively to mitigate his damages." Utah Farm Prod. Credit Ass'n v. Cox, 627 P.2d 62, 64 (Utah 1981). See also Angelos v. First Interstate Bank of Utah, 671 P.2d 772, 777 (Utah 1983); John Call Eng'g v. Manti City, 795 P.2d 678, 680 (Utah App. 1990); Restatement (Second) of Contracts § 350 (1981). While the plaintiff bears the burden of proving a contract breach and the resulting damages, the defendant bears the burden of showing "with specificity why the damages sought are not proper because of successful efforts to mitigate or a failure to reasonably mitigate." John Call, 795 P.2d at 680-81.
The trial court in this case recognized that the treatment of compensation paid to Associates' principals was a question of first impression and in its Memorandum Decision made alternate findings on damages in the event the appellate court concluded, as we have, that such compensation should not be deducted from corporate income in calculating lost profits. The trial court's alternative analysis followed the second Bettius case, Bettius & Sanderson, P.C. v. National Union Fire Insurance Co., 892 F.2d 34 (4th Cir.1989) (Bettius II), where the Court of Appeals held that the district court on remand had correctly offset the corporate loss, refigured to properly treat compensation as required in the first Bettius opinion, by the amount the principals made by practicing law with other firms. Id. at 35. In following Bettius II, the trial court here determined that none of the individual physicians suffered any damages and that Associates' damages were $14,883 under the alternative analysis, the same as if Associates was treated as a business corporation as under the trial court's primary approach. While we agree with the general principle employed in Bettius II, namely that amounts earned or which should have been earned by the shareholders after breach of the corporation's contract mitigate the corporation's damages, we disagree with specific aspects of the trial court's application of that principle in calculating damages in this case.
Viewing Associates as tantamount to a partnership according to the Bettius paradigm, its recoverable damages are the amount which remains after calculating the total income the professional corporation would have received under the Surgical Agreement, subtracting corporate expenses exclusive of the principals' salaries, and subtracting further any actual or expected *1040 reasonable mitigation by the corporation's principals. Therefore, Associates would incur damages equivalent to income lost by its principals, insofar as the loss could not be reasonably mitigated, as well as profits remaining in excess of principals' salaries and other expenses.
In this case, the trial court's finding that Drs. Morris, Madlang, and Rivera mitigated the full amount of their salaries is not clearly erroneous. With respect to Dr. Crosby, the trial court found that he suffered from substance abuse problems and that those problems, rather than breach of the contract, caused Dr. Crosby to earn less money after termination of the Surgical Agreement than he otherwise would have. These findings are not clearly erroneous.[7] We therefore will not disturb the trial court's findings concerning corporate damages insofar as these four physicians affect that calculation.
Mitigation analysis as concerns Drs. Merrill and Wilcox is less straightforward. According to the unchallenged testimony of the late Dr. Merrill's wife at trial, Dr. Merrill would have retired when he did whether the Surgical Agreement continued or not. In its alternate findings, the trial court found that because Dr. Merrill's retirement was unconnected to the breach, he suffered no damages.
The simple fact that Dr. Merrill, who was 67 years old at the time of breach, acted upon his plans to retire instead of seeking new employment does not preclude him from obtaining the benefits he would have received, notwithstanding his retirement, if the contract had not been breached. Accordingly, Associates suffered damages based upon the income Dr. Merrill would have received between the time of the breach and his planned retirement date. Associates is also entitled to any diminution in deferred compensation benefits that Dr. Merrill would have received. Those benefits would have been funded by revenue from the Surgical Agreement, and because the revenue foregone as a result of the breach was a lost benefit of the bargain, those lost benefits must be regarded as damages.[8]
As regards the last physician, Dr. Wilcox, the trial court found that he was eligible for retirement but would not have retired had the Surgical Agreement continued in effect. Because he did not attempt to mitigate his damages, the court concluded he sustained no loss as a result of the Hospital's breach. At the time of the breach, however, Dr. Wilcox was 65 years old and was not a board certified anesthesiologist. Both of these facts weighed heavily against Dr. Wilcox finding suitable employment in his field. Dr. Wilcox testified that he did not seek employment because the effort to establish a new practice and develop new contracts for the few more years that he would have worked held little promise of success. This evidence was not refuted. In order to receive remuneration for damages incurred, a plaintiff is not required to make every effort possible to mitigate damages, but need only take reasonable steps to mitigate avoidable damages. See Angelos, 671 P.2d at 777. Working under the Surgical Agreement, Dr. Wilcox had reasonably expected that he would have been able to maintain his ongoing practice and collect his salary without undertaking significant and financially risky efforts to establish a new practice. Because such a requirement would be unreasonable under the circumstances, the mitigation doctrine does not require Dr. Wilcox to establish a new practice.
*1041 In concluding that Dr. Wilcox sustained no loss because he failed to seek employment after the Hospital breached, the court incorrectly applied the mitigation doctrine. Where a court's finding "is induced by an erroneous view of the law," that finding is clearly erroneous. Hoth v. White, 799 P.2d 213, 216 (Utah App.1990). Accordingly, the trial court clearly erred in concluding that Dr. Wilcox sustained no damages whatsoever. At the very least, Associates is entitled to the difference between the deferred compensation benefits Dr. Wilcox actually received and the income he would have received if there had been no breach.
To summarize then, on remand the court should subtract common corporate expenses excluding salary paid to shareholders from the corporate gross revenue that would have been derived from the Surgical Agreement, and further subtract those amounts which individual physicians should have or did in fact mitigate. Although most of the lost income was fully mitigated, we remand for the court to reevaluate the damages attributable to Drs. Merrill and Wilcox and to adjust Associates' damages accordingly.

C. Call-back Damages
In addition to seeking damages for improper termination of the Surgical Agreement, Associates sought $40,000 under the call-back provision in paragraph ten of the Obstetrical Contract. Under that provision, if a nurse anesthetist was required to come to the hospital during one of the physicians' night calls, the Hospital agreed to reimburse Associates $50 for each call-back. Although Associates' expert testified at trial that the Hospital owed Associates $29,950 in unpaid call-back payments and $14,844 in interest, the trial court made no specific findings regarding call-back damages and further denied Associates' Motion To Amend Memorandum Decision requesting call-back charges be included as damages. Associates argues that the trial court's denial of damages under the call-back provision was clearly erroneous and should be reversed by this court. We find a trial court's findings clearly erroneous if they "are against the clear weight of the evidence, or if we otherwise reach[] a definite and firm conviction that a mistake has been made." State v. Walker, 743 P.2d 191, 193 (Utah 1987). See also Utah R.Civ.P. 52(a). Furthermore, "[a] finding is clearly erroneous if it is without adequate evidentiary support or is induced by an erroneous view of the law." Hoth v. White, 799 P.2d 213, 216 (Utah App.1990).
Associates submitted into evidence its November 1985 written demand for a $40,000 payment of the call-back charges covering the prior three-year period. Associates' expert testified that the Hospital actually owed $29,950 in call-back charges for the three-year period in question, as well as $14,843.71 in interest, and explained in detail the basis for his opinion. The checks upon which their expert based his opinion were also admitted into evidence. The Hospital never cross-examined Associates' expert about his call-back damages testimony and presented absolutely no evidence to indicate it did not owe the money claimed. The Hospital failed to provide this court with any legal theory as to why the award of call-back damages should be denied in light of the evidence that Associates presented at trial, nor did the Hospital point to anything in the record that refutes Associates' evidence.
Because the only evidence regarding the call-back damages supports Associates' claim, we conclude that the trial court erred in not awarding those damages to Associates.[9] Accordingly, we hold that Associates is entitled to $29,950 in call-back damages, but because the precise amount of damages was not established until trial and apparently was not sufficiently straightforward as to have been calculated mathematically before then, Associates is due no prejudgment interest. See infra note 11.

*1042 PREJUDGMENT INTEREST
Associates appeals the trial court's denial of prejudgment interest and cites the longstanding Utah rule that prejudgment interest is awarded "where the damage is complete and the amount of the loss is fixed as of a particular time, and that loss can be measured by facts and figures." Bjork v. April Indus., Inc., 560 P.2d 315, 317 (Utah), cert. denied, 431 U.S. 930, 97 S.Ct. 2634, 53 L.Ed.2d 245 (1977). Associates argues that because its expert based his estimate of lost profits on mathematically derived projections of revenues, its damages were fixed and ascertainable so as to justify an award of prejudgment interest. The Hospital agrees with the statement of the rule, but disagrees with its application in this case.
While damages in this case have been determined with sufficient certainty to justify a damage award, the standard that must be met to obtain prejudgment interest on lost profit is whether such a claim "is ascertainable with mathematical accuracy." Canyon Country Store v. Bracey, 781 P.2d 414, 422 (Utah 1989). This court has held that
[f]or damages to be calculable with mathematical certainty, they must be ascertained "in accordance with fixed rules of evidence and known standards of value, which the court or jury must follow in fixing the amount, rather than be guided by their best judgment in assessing the amount to be allowed for past as well as for future injury, or for elements that cannot be measured by any fixed standards of value."
Price-Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc., 784 P.2d 475, 483 (Utah App.1989) (quoting Fell v. Union Pac. Ry. Co., 32 Utah 101, 88 P. 1003, 1007 (1907)). Although Associates' records of past revenues and expenses allowed damages to be calculated with a greater degree of certainty than would otherwise have been possible if this case involved a new business, see, e.g., Canyon Country, 781 P.2d at 422, the very nature of lost future profits injects an air of uncertainty and speculation into the calculation of damages.[10] The damages at the time of the Hospital's breach were by no means ascertainable with mathematical certainty. Despite the fact that Associates' expert used sound mathematical methods in arriving at his damages estimate, he did not use the only possible method, nor did he measure the damages against a fixed standard. The factfinder in this case had to assess expert testimony and apply its best judgment to determine a fair amount for lost profits. While the expert's estimates were a reliable enough basis for awarding damages, the assumptions used to arrive at those estimates are by no means the only way to arrive at Associates' damages. Given the uncertainty inherent in predicting lost future profits in this case, we affirm the trial court's denial of prejudgment interest.[11]

CONCLUSION
On remand, the trial court should treat the physician-shareholders' salaries basically *1043 as it would if Associates was a partnership. We affirm the trial court's findings concerning mitigation as to four of the physicians, but remand for determination of mitigation for the two other physicians. The trial court should also award damages to Associates' based on the call-back provision of the contract, but we affirm the trial court's decision denying Associates prejudgment interest on any aspect of its damages.
BENCH and JACKSON, JJ., concur.
NOTES
[1] Emphasis and parenthetical comments are taken verbatim from the trial court's findings.
[2] The key to Associates' position was that it looked to the long-standing surgical arrangement as the mainstay of its practice; it was willing to try doing the obstetrical work as well, but with considerable trepidation. Associates contends it would never have made continuation of its bread-and-butter work contingent on continuation of the new, less desirable Obstetrical Agreement.
[3] Surely the Hospital did not expect that as a benefit of the bargain from entering into a contract with a professional corporation, rather than a partnership, it could breach its contract with comparative impunity. Southern Bell's approach leads to the inevitable result that because the Hospital fortuitously contracted with anesthesiologists who happened to operate in a corporate form, it should reap a windfall it would not have received by contracting with a partnership. The corporate form was important to Associates' shareholders for their own purposes; from all that appears, it was not a factor in the Hospital's decision to contract with Associates.
[4] Associates also relies upon Fidelity National Bank v. Jeffrey M. Kneller, P.C., 194 Ga.App. 55, 390 S.E.2d 55 (1989), cert. denied, Georgia Supreme Court, February 15, 1990 (unpublished order). This case adds nothing to the analysis of the issue at hand, but only follows the Bettius case, discussed hereafter, as authority for the rule that in calculating damages, the net profit of a professional corporation includes sums paid to corporate principals as salary. Fidelity, 194 Ga.App. 55, 390 S.E.2d at 60.
[5] The Professional Corporation Act excepts the secretary and treasurer from the requirement that all officers be members of the relevant profession. Utah Code Ann. § 16-11-8 (1991).
[6] We limit this holding to professional corporations in which the shareholders and employees are virtually the same persons. Where a professional corporation consists of a few shareholders and many paid employees who offer professional services, such a corporation would appear to be more like a traditional business corporation, and we would not necessarily be inclined to apply the same analysis.
[7] Appellants argue that Associates would have fully compensated Dr. Crosby during the time he suffered from substance abuse pursuant to their Deferred Compensation Plan. Testimony at trial concerning this issue was sparse and equivocal, and, upon close examination, the Deferred Compensation Plan would have been triggered only if the Board of Directors determined that Dr. Crosby's condition was permanent. Associates' evidence in this regard is therefore too speculative to make the court's findings with respect to Dr. Crosby clearly erroneous.
[8] Whether lost corporate income is in the form of salaries or deferred income is irrelevant in calculating lost corporate profits. Thus, our conclusion concerning lost deferred income benefits is merely a particularized application of the Bettius rule.
[9] Although paragraph ten in the Obstetrical Agreement calls for the Hospital to pay call-back charges "on a monthly basis," the Hospital does not contend that failure to bill monthly precludes collecting these charges at a later date.
[10] The Canyon Country court found that lost profits were speculative in that case because the business in question was new and was involved in pending bankruptcy proceedings. Canyon Country, 781 P.2d at 422. We do not read Canyon Country to preclude award of prejudgment interest for lost profits in all cases, nor do we so hold.
[11] Similar reasoning precludes awarding prejudgment interest for call-back damages. In its Amended Complaint, Associates claimed $40,000 damages for unpaid call-back charges. Yet, at trial, Associates' expert witness testified that call-back charges in the amount of only $29,950 accrued during the period of the Obstetrical Agreement. Although arriving at this figure should only have been a matter of adding up the number of late-night visits made by nurse anesthetists over the contract period, it would be unfair to charge prejudgment interest against the Hospital when Associates, due to inadequate records or otherwise, apparently could not arrive at a mathematically precise figure at the time it filed its Amended Complaint. Furthermore, based on its own lack of diligence in billing the Hospital monthly as called for in the contract, Associates can not claim that the Hospital was unjustly enriched. See Canyon Country, 781 P.2d at 422 (aside from fully compensating the nonbreaching party, one purpose for awarding prejudgment interest is to avoid a breaching party's unjust enrichment).