ALLEN–HOWE SPECIALTIES CORPO-
RATION, a Utah Corporation,
Plaintiff and Appellant,

v.

U. S. CONSTRUCTION, INC., a corpora-
tion, Jacobs Engineering Co., a corpora-
tion, Wyoming Mineral Corporation, a
corporation, and Kennecott Copper Cor-
poration, a corporation, Defendants and
Respondents.

No. 16209.

Supreme Court of Utah.

April 21, 1980.

Peter W. Billings, Warren Patten, and Charles B. Casper of Fabian & Clendenin, Salt Lake City, for plaintiff and appellant.

Gordon L. Roberts, Daniel M. Allred and Val R. Antczak of Parsons, Behle & Latimer, Salt Lake City, for defendants and respondents.

MAUGHAN, Justice:

Plaintiff, a subcontractor, initiated this action, pleading in seven counts, to recover $75,010.42 for labor and materials expended in erecting a metal building to house a uranium extraction plant. The defendants, after extensive discovery, moved for summary judgment on the alternative grounds that certain contractual provisions precluded recovery or an accord and satisfaction had been effected. The trial court granted defendants summary judgment on five of the counts. Plaintiff dismissed one count and its claim against Kennecott Copper; liability on one count was admitted. Plaintiff appeals, contending it is entitled to a trial to establish its claim for an additional $64,108.77. The judgment of the trial court is affirmed. No costs awarded.

Wyoming Mineral Corporation (Wyoming), a subsidiary of Westinghouse Electric Corporation, leased a parcel of land from Kennecott Copper in Bingham Canyon, Utah, to build a uranium extraction facility. U. S. Construction, Inc. (U.S.C.) entered into a contract with Wyoming to complete the cement work and erect a building on the land; Wyoming assigned its interests in this contract to Jacobs Engineering Company (Jacobs), which acted as general contractor.

On April 11, 1977, plaintiff entered into a subcontract with U.S.C. to erect a metal building for Wyoming, for the price of $53,-372.00. Plaintiff has been paid or tendered $64,193.65. (The count upon which liability was admitted was for $10,901.65, this sum included $10,623.25 which had been previously tendered and an additional $278.40, which had not been tendered because of a bookkeeping error.) Plaintiff claims an additional $64,108.77, by means of alternative counts, sounding in contract, breach of contract and quantum meruit against its contractee, U.S.C. Plaintiff has also asserted a claim against Jacobs for interference with the plaintiff's performance of its subcontract.

In essence, plaintiff claims that the nature and scope of its work under its subcontract was substantially changed by site congestion and the delays and interference from process equipment and from other trades and crafts, which increased plaintiff's costs. Plaintiff contends it had to perform under conditions it had not anticipated at the time it executed the contract.

These conditions, according to plaintiff, compelled it to perform its work at 35% efficiency; it, therefore, charged 35% of its work to the contract and claimed an additional 65% as extra work beyond the scope of the contract. A portion of plaintiff's claim involved the costs of transferring material from a stockpile located approximately 100 yards from the building site, and the work entailed in cleaning threads on the steel that had been improperly painted.

The defense is predicated on certain provisions contained in plaintiff's subcontract, which incorporated the terms and provisions of the contract between U.S.C. and Wyoming. The subcontract provided no decrease or increase of the subcontract price shall be binding unless agreed upon in writing. The contract between Wyoming and U.S.C. required that if the contractor considered any order or direction a change in the work, although not so identified by the owner, the Contractor shall within five days after notice of such direction submit a written request for the issuance of a written change order. The failure to follow such a prescribed course is deemed an agreement such direction did not make any change in the work required by the contract.

Plaintiff was further bound by the following provision in the contract between Wyoming and U.S.C.:

"Acquaintance With Conditions And Requirements

"The Contractor, by its execution of the Construction Agreement, represents that he has visited or has had full opportunity to examine the site upon which the work is to be erected and the specifications, drawings, and other contract documents; that he has satisfied himself as to the requirements of the work and all conditions which may affect the work; that his entry into the contract has not been induced either wholly or in part by any promises, representations or statements on behalf of the Owner, his agents or representatives other than those set forth in the contract. The Contractor further represents that the price set forth in the Construction Agreement has been determined with due regard to all such conditions and requirements affecting the work, as well as the difficulties and delays incident to work of the nature contemplated hereby, and agrees that no claim for any increase in such price shall be made except as specifically provided in the contract."

In addition to the contractual provisions, the discovery process revealed plaintiff's knowledge of the very limited space at the building site. Prior to execution of the subcontract, plaintiff sought another contract on a separate phase of construction. Plaintiff submitted a document which stated:

"We further request because of the tight work area, we be the only steel erector on the job during our scheduled erection dates."

Plaintiff's president further conceded payment or tender had been made in every case where a claim for extra work had been submitted and negotiated in advance. The President of plaintiff further admitted the location was brought to his attention immediately after the steel arrived at the stockpile, and he had an opportunity to submit a claim for extra work for hauling the steel from the storage area and failed to do so. The President further conceded, shortly after the work commenced he conferred with a representative of U.S.C. concerning the processing of claims for extra work; he was informed extra work must be approved prior to commencing such work. Plaintiff's claims for hauling the steel from the stockpile and for cleaning the steel, which was improperly painted, were submitted in the form of back charges for extra work sometime after its performance. Payment was refused on the ground there was no authorization as an extra from U.S.C. Plaintiff's failure to comply with the contractual provisions precluded its claim for extra work.

■ A considerable portion of plaintiff's claim involved alleged additional expenses incurred by reason of delays and inefficient scheduling, which caused simultaneous work by different crafts on the crowded work site.

The subcontract provided:

"Section 6. In the event the Subcontractor's performance of this Subcontract is delayed or interfered with by acts of the Owner, Contractor or other subcontractors, he may request an extension of the time for the performance of the same, as hereinafter provided, but shall not be entitled to any increase in the Subcontract price or to damages or additional compensation as a consequence of such delay except to the extent that Contractor is entitled to receive an increase in contract price from the Owner."

The contract between Wyoming and U.S.C. provided:

"9. Simultaneous Work By Others

(a) The Owner shall have the right to perform or have performed in and about the construction site during the time when the Contractor is performing the work required by this contract, such other work as Owner may desire. The Contractor shall make every reasonable effort to perform its work hereunder in such manner as to enable both the work under this contract and such other work to be completed without hindrance or interference with each other. Any claim of the Contractor arising out of any alleged interference due to the conduct of such other work shall be made to the Owner in writing within five (5) days of the occurrence of the alleged interference and shall be deemed to have been waived unless so made."

▬ All of the invoices submitted by plaintiff to U.S.C. were beyond the five day limitation period set forth in the foregoing provision; so any claim of U.S.C. against the owner for the alleged interference would be deemed waived. Furthermore, plaintiff attributed some of the problems of interference on the congested building site to initial delays in the project caused by rain. The contract between Wyoming and U.S.C. specifically precludes any claim for additional compensation or damages by reason of any delay. Since there is no basis for

U.S.C. to claim damages or additional compensation from Wyoming on the claims asserted by plaintiff, plaintiff is not entitled under the provisions of Section 6 of its contract to an increase in the subcontract price, or damages for delay, or interference caused by the acts of the owner, contractor, or other subcontractors.

This Court affirmed a summary judgment based on a "no damages for delay" provision in a construction contract in *Western Engineers, Inc. v. State Road Commission*.[1] This Court ruled parol evidence could not be introduced to prove the delay was unreasonable or was not contemplated at the time the contract was executed, where there was no ambiguity in the "no damage for delay" provision. Although plaintiff characterizes its claim as one for extra work, which by definition is indicative of work beyond that required by the contract,[2] its claim for compensation is clearly predicated on delay within the purview of Section 6 of the Subcontract. Plaintiff ascribed its increased costs to the following causes:

"Interference of structures, process equipment, piping, mechanical, electrical work, materials and workmen with safe and orderly erection of structural steel, liner panel and exterior panels.

"Initial delays having to do with concrete pours, material deliveries, improper base plates, lack of marks on steel, lack of shims, mud and inadequate back-filling, delays in steel deliveries and painting, and fabricating errors and corrections have compounded the problem of interferences, because other crafts and trades have had to proceed with their work to meet project requirements."

Plaintiff urges that the defenses in the contract are not applicable for the reason its claim is for work beyond the scope of the contract, and is based on quantum meruit. A response to such an argument is succinctly expressed in *Nelse Mortensen & Co., Inc.*

1. 20 Utah 2d 294, 437 P.2d 216 (1968).

2. See *Wilson v. Salt Lake City*, 52 Utah 506, 516, 174 P. 847 (1918).

*v. Group Health Cooperative of Puget Sound :* [3]

"We hold, in summary, that if owner-caused delay in construction was of a nature contemplated by the parties and specific provisions of their contract provide a remedy, or the contract otherwise supplies a means of compensation for such delay, then the delay cannot be deemed unreasonable to the extent the contract terms should be abandoned in favor of quantum meruit recovery."

■ In other words, damages cannot be awarded for delays contemplated by the parties and should be controlled by the contractual remedies, unless the delays can be said to be so excessive and unreasonable as to fall outside the scope of the contract and warrant an additional recovery in quantum meruit. [4]

In an alternative count, plaintiff alleged the actions of U.S.C. constituted a breach of contract for which plaintiff sought damages in a sum equal to their claim for the costs incurred by delay:

"It is usually on the theory that the contractee has breached its contract by causing delay to the contractor in the performance of his agreement that the contractor is permitted, in absence of a provision to the contrary, to recover for such delay. Accordingly, a 'no damage for delay' clause would be rendered meaningless if it were regarded as inapplicable simply because the contractee had breached its contract in causing the delay. . . . It is not sufficient to take a claim out of the operation of the 'no damage' clause that the damages for delay are asserted to arise out of breach of the construction contract. . . ." [5]

■ In a separate count, plaintiff claimed damages for the alleged tortious conduct of Jacobs, the assignee of owner, Wyoming, in the contract between U.S.C. and Wyoming. Plaintiff alleged Jacobs caused others to place on the job site certain structures and impediments, which prevented plaintiff from performing its work as contracted; and Jacobs further required plaintiff to proceed in a sequence at locations other than those contemplated by plaintiff. Plaintiff sought damages in the amount it claimed against U.S.C. as compensation for extra work. Plaintiff characterized Jacobs' conduct as interference.

■ The provisions in Section 6 of the subcontract preclude a claim for damages as a consequence of delay or interference with the performance of the subcontract by acts of the owner. [6] The acts alleged do not constitute the type of active interference which precludes application of a "no damages" provision in a construction contract. A "no damage" clause will not exculpate the contractee for liability for damages for delay with the work of the contractor where such interference is direct, active, or willful : [7]

"In order to constitute interference there must be reprehensible conduct of the contractee which is in collision with or runs at cross purposes to the work of the contractor. 'Active interference' requires some affirmative, willful act, in bad faith, to unreasonably interfere with the contractor's compliance with the terms of the construction contract. It clearly requires more than a simple mistake, error in judgment, lack of total effort, or lack of complete diligence. In particular cases it has been held that the facts shown did not constitute such interference as would obviate the 'no damage'

---

**3.** 90 Wash.2d 843, 586 P.2d 469, 470 (1978).

**4.** *Nelse Mortensen & Co., Inc. v. Group Health Cooperative of Puget Sound,* 17 Wash.App. 703, 566 P.2d 560, 572 (1977).

**5.** 74 A.L.R.3d 187, Anno: Validity And Construction Of "No Damage" Clause With Respect To Delay In Building Or Construction Contract, Sec. 7[f], p. 221.

**6.** Id., Sec. 22, pp. 260–261; also see *Frank T. Hickey, Inc. v. Los Angeles Jewish Community Council,* 128 Cal.App.2d 676, 276 P.2d 52, 59 (1954).

**7.** Id., Sec. 7[e], p. 219.

clause, especially where the alleged interference involved nothing more than the ordinary types of delay with which most contractors are frequently confronted or delays which clearly were in the contemplation of the parties." [8]

The trial court did not err in awarding summary judgment to the defendants.

There is one other aspect which merits brief consideration. Defendants also urged before the trial court there had been an accord and satisfaction. The court did not designate the specific grounds upon which judgment was granted. On appeal plaintiff vigorously urged there was no accord and satisfaction, with this contention we agree.

In accordance with the provisions of the subcontract, U.S.C. submitted partial payment of the contract price to plaintiff as the work progressed. On the back of the check was a printed form, which provided:

"Endorsement of this check acknowledges payment in full for all labor and/or materials and/or equipment furnished to date by payee and any subcontractors thereof toward construction and improvements on the property described on the face of this instrument and the undersigned hereby waives all lien rights in respect to such labor and/or materials and/or equipment heretofore performed or furnished, and the undersigned payee further acknowledges and guarantees that this payment is in full satisfaction of all labor, laborers and suppliers of labor and/or materials of said premises performed prior to this date and shall hold the payor harmless against any claims for labor or materials so furnished. Payee further acknowledges and warrants that the labor or material for which payment is received hereby was actually performed or furnished by the person or persons receiving payment therefor.

"This instrument may not be negotiated until dated and signed by payee(s)."

U.S.C. urged the acceptance and negotiation of the progress payments constituted an accord and satisfaction; so the claims for additional sums for labor or materials, which were incurred during the interim for which the progress payment was issued, were discharged.

■ An accord and satisfaction is a method of discharging *a contract.*[9] The payment of a part of a debt (in situations such as the one at hand), does not discharge it, even though the debtor exacts a promise that it will do so. The debtor, by making part payment is doing nothing more than he is legally obligated to do; and, therefore, he gives the creditor no consideration for the promise that part payment will be accepted to discharge the entire debt.[10]

■ Nothing in the present record suggests the parties to the subcontract intended to group, in this contract, several separate engagements, each with its own separate consideration. A survey of section 3 of the subcontract clearly indicates it was an entire contract with *one* consideration for doing the whole work, with payment on account as the work progressed.[11]

8. Id., Sec. 7[e], p. 220; also see *City of Seattle v. Dyad Construction, Inc.*, 17 Wash.App. 501, 565 P.2d 423 (1977), as a type of case involving active interference with the contractor's work.

9. *Cannon v. Stevens School of Business, Inc.*, Utah, 560 P.2d 1383, 1385 (1977).

10. *Tates, Inc. v. Little America Refining Co.*, Utah, 535 P.2d 1228, 1229 (1975).

11. Section 3. The Contractor agrees to pay the Subcontractor for furnishing the materials and performing the work as specified herein the sum of: $53,372.00 subject to additions and deductions for changes agreed upon or determined, as hereinafter provided. Partial payment will be made to the Subcontractor each month in an amount equal to 90% of the value of work and materials incorporated in the construction and/or materials delivered to the site of the work by the Subcontractor, as estimated by the General Contractor. . . . Upon complete performance of this Subcontract by the Subcontractor, Contractor will make final approval and acceptance of Subcontractor's work and the Contractor will make final payment to the Subcontractor of the balance due to him under this Subcontract within 10 days. No partial payment to the Subcontractor shall operate as approval and acceptance of work done or material furnished under this Subcontract.

"Thus, where the building or construction contract fixes a total price for the entire work covered, and provides that payments are to be made to the contractor periodically as the work progresses, in amounts to be determined by or based upon estimates or computations of the amount or value of the work accomplished during the period elapsed, but also provides that the contractee shall retain a percentage of each of the installment or progress payments until the completion of all the contract work, it is more generally considered that the contract is entire and is not rendered divisible by such a provision for progress payments." [12]

Since the subcontract was indivisible and plaintiff refused tender of the last payment, the contract could not have been discharged by the prior part payments. This, notwithstanding the printed form on the back of the checks of U.S.C.

CROCKETT, C. J., and WILKINS and HALL, JJ., concur.

STEWART, J., dissents.

12.  22 A.L.R.2d 1343, Anno: Building or construction contract providing for installment or "progress" payments as entire or divisible, Sec. 2, p. 1346.