2006 UT App 331

**ALPHA PARTNERS, INC., a Utah corporation, Plaintiff, Appellant, and Cross-appellee,**

v.

**TRANSAMERICA INVESTMENT MANAGEMENT, L.L.C., a limited liability company, Defendant, Appellee, and Cross-appellant.**

No. 20040605–CA.

Court of Appeals of Utah.

Aug. 10, 2006.

Eric G. Easterly, Park City, and Stephen K. Christiansen, Van Cott Bagley Cornwall & McCarthy, Salt Lake City, for Appellant.

Julianne P. Blanch and David Jason Hawkins, Snow Christensen & Martineau, Salt Lake City, for Appellee.

Before GREENWOOD, Associate P.J., DAVIS, and THORNE, JJ.

## OPINION

THORNE, Judge:

¶1 Alpha Partners, Inc. (Alpha) and Transamerica Investment Management, L.L.C. (TIM) both appeal from the trial court's order entered after a bench trial relating to their competing breach of contract claims. We affirm in part and reverse in part.

## BACKGROUND [1]

¶2 Alpha is a Utah corporation that specializes in developing marketing programs for companies, such as TIM, that provide investment advisory services. On December 8, 2000, Alpha entered into a contract with TIM to create an investment marketing program for TIM's services to third-party institutional and wholesale investors. The contract, entitled "letter of agreement," was drafted by Liz Hecht, the owner and president of Alpha, and accepted and signed by William T. Miller, the senior vice president and chief operating officer of TIM.

¶3 The contract gave a detailed description of the services Alpha was to provide and included a proposed timetable and estimated fees and expenses. Alpha anticipated finishing the project the week of April 23, 2001, "[c]ontingent upon comprehensive and timely feedback from [TIM]." The estimated total fee for the project was $239,000, discounted to $225,000 if Tim paid the full price in advance. Alpha was to send periodic invoices to TIM for expenses, and upon project completion, Alpha was to submit a final invoice.

¶4 An explanation for the project fee calculation was provided in the contract's "Terms and Conditions." The contract stated that:

> The fees quoted here are based on an estimate of time required by Alpha Partners to perform the work described as well as fair market value for these services. Fees may vary 20% above or below the estimates stated in this letter of agreement. Fees would exceed this estimate by more than 20% only if [TIM] requests expanding the scope of the project as defined here (see Additions, Revised Estimates and Contingencies . . .).

The contract addressed the manner in which revisions and additions to the project would

---

1. The facts of this case are largely undisputed for purposes of this appeal, and we recite the facts as found by the trial court or otherwise found in the record.

be handled and provided that "[a]ny significant revisions or additions to the services or components described here will be billed as additional services above this estimate." Further, Alpha was to "submit written estimates for [TIM's] approval if, for any reason, [Alpha] expect[ed] to exceed the total fee quoted here by more than 20%." Although the anticipated project completion date was in April 2001, the contract provided that "[i]f [TIM] postpones project completion for more than nine months from the date of project inception, it will be necessary to submit an estimate revision for [TIM's] approval."

¶ 5 Pursuant to the contract, TIM took advantage of the discounted rate and paid Alpha $225,000 in advance. Alpha immediately began working on the project, completing the first two stages of the project in January 2001. Although Alpha was very efficient on its end, approval of ideas by TIM took much longer than anticipated because each decision required approval from TIM's board of directors. TIM had difficulty deciding on a tag line and logo mark in particular, given the highly subjective nature of those items. As a result, Alpha granted several extensions to the proposed time line as the project began to take shape.

¶ 6 Throughout this time, Miller was Alpha's main contact at TIM. In July 2001, however, Miller was fired by John Riazzi, TIM's chief executive officer. Riazzi then became Alpha's primary contact at TIM. To keep the project on track, Hecht arranged a meeting with Riazzi on July 20, 2001. At that meeting Riazzi articulated his interpretation of the contract, telling Hecht that TIM had paid Alpha up front in full for the project and would not pay anything more. Hecht agreed, so long as there were no more long delays.

¶ 7 After the July meeting, Riazzi gave his approval for the logo mark, which was required to move the project toward completion. Riazzi rescinded his approval, however, when he learned that he needed to get additional approval from TIM's parent company before making a final decision on the logo. This caused further delays, and another meeting was held on August 17. At this meeting, Riazzi expressed his approval of the work Alpha had presented, but was unable to provide a decision on the logo mark. Based on these meetings, Riazzi knew that delays could result in additional fees to TIM.

¶ 8 On August 31, Hecht sent Riazzi a memo that included a summary of fees and expenses as of that date. The memo also included "invoices for the main project per the December 8, 2000 letter of agreement" and a "schedule of project delays by [TIM]." The memo noted that:

The delays to date (from April, the original project completion date, through the present) have caused project billings to go well into the plus–20% range (the letter of agreement indicates that fees may vary plus or minus 20% of project estimates). Total billings to date reflect significant down time and the need for remobilization of our team after lengthy delays, as well as the costs associated with project management over a much longer period than originally anticipated.

The memo informed TIM that if the project went beyond the September 8, 2001 deadline, Alpha would submit an estimate revision for TIM's approval. One of the invoices requested an additional $43,000, 18% above the initial fee estimate. Riazzi received the invoices in early September and attempted to contact Hecht, but did not pay the invoice.

¶ 9 TIM and Alpha continued to work on the project, finally settling on all logo marks and tag lines in September 2001. On October 20, after several requests for payment of the August invoice, Hecht directed her partners to stop work if TIM did not submit payment by October 24. On October 29, Hecht called Riazzi and again requested payment. Riazzi informed Hecht that TIM had paid Alpha the full price in advance and that TIM would not pay the additional $43,000. Hecht responded that she would turn the matter over to her attorney, effectively terminating the contract. TIM then hired another marketing firm to complete the project. TIM paid the new firm $60,797.17 for marketing materials, that were delivered to TIM in the second quarter of 2002.

¶ 10 On December 31, 2001, Alpha filed a complaint against TIM alleging breach of contract, as well as other causes of action

that it later dismissed. Specifically, Alpha complained that TIM failed and refused to pay a total of $64,950 owed under the contract and that this constituted a breach of contract. On March 6, 2002, TIM filed an answer and counterclaim against Alpha denying the claims and alleging breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and fraud. TIM alleged that Alpha breached the contract by charging more than it was entitled to under the agreement and that Alpha breached the covenant of good faith and fair dealing by charging an additional 18% without any justification. TIM also alleged that Alpha was unjustly enriched since TIM paid a total of $263,000 and never received any completed materials. Finally, TIM argued that Hecht intended to deceive TIM by not informing Riazzi of Alpha's intent to charge additional fees at the July meeting, when Riazzi stated that TIM would not pay additional fees.

¶ 11 A bench trial was held in June 2004. On August 10, 2004, the court entered an order dismissing both parties' claims. The court found that TIM did not breach the contract by failing to provide timely information to Alpha and by refusing to pay additional fees since the contract was ambiguous and indefinite. The court stated that the contract terms relating to timing were indefinite since the contract included a "proposed" timetable that Alpha revised on its own several times, and therefore, TIM could not breach the contract by its delay. Furthermore, the court found that if a delay warranting additional fees occurred Alpha was required to submit a revised estimate for TIM's approval and that the contract did not allow Alpha unlimited discretion to increase its fees within a 20% range.

¶ 12 The court also found that Alpha did not breach the contract or the covenant of good faith and fair dealing. The court determined that Alpha's termination of the contract was not a breach of the contract, that no breach of the implied covenant occurred since TIM was not fully cooperating, and that TIM's inaction, coupled with the substantial performance by Alpha, excused further performance by Alpha. As to TIM's claim for

unjust enrichment, the court concluded that Alpha had done substantial work on the project that justified the fees paid. The court addressed the fraud claim and held that TIM failed to show by clear and convincing evidence that Hecht or Alpha made a false statement intended to cause detriment to TIM.

¶ 13 Finally, the court noted that TIM filed an offer of judgment under rule 68 of the Utah Rules of Civil Procedure, and that TIM was therefore entitled to reimbursement of post-offer costs. See Utah R. Civ. P. 68(b). The court reviewed the affidavit of costs and ordered Alpha to pay TIM $3094.78 pursuant to rule 68. See id.

## ISSUES AND STANDARDS OF REVIEW

¶ 14 Alpha and TIM each contend on appeal that the trial court erred in dismissing their respective breach of contract claims. " 'Interpretation of the terms of a contract is a question of law. Thus, we accord the trial court's legal conclusions regarding the contract no deference and review them for correctness.' " Pack v. Case, 2001 UT App 232, ¶ 16, 30 P.3d 436 (quoting Nova Cas. Co. v. Able Constr., Inc., 1999 UT 69, ¶ 6, 983 P.2d 575).

¶ 15 Alpha claims that the trial court erred when it concluded that TIM did not breach the contract because the contract was ambiguous and indefinite and when it concluded that Alpha was not entitled to contract damages. "Whether the terms of a contract are ambiguous is a question of law; this court reviews the trial court's conclusion under a correctness standard." Anesthesiologists Assocs. of Ogden v. St. Benedict's Hosp., 852 P.2d 1030, 1035 (Utah Ct.App. 1993), rev'd on other grounds, 884 P.2d 1236 (Utah 1994).

¶ 16 TIM claims that the trial court erred in determining that Alpha did not breach the contract by failing to provide completed marketing materials to TIM and that TIM was not entitled to damages incurred by Alpha's failure to complete the project. In a related claim, TIM argues that the trial court erred in concluding that Alpha was not unjustly enriched when it was paid

$225,000, in advance, but did not deliver the promised materials.

Whether a claimant has been unjustly enriched is a mixed question of law and fact. We uphold a lower court's findings of fact unless the evidence supporting them is so lacking that we must conclude the finding is clearly erroneous. Furthermore, we afford broad discretion to the trial court in its application of unjust enrichment law to the facts.

*Groberg v. Housing Opportunities, Inc.*, 2003 UT App 67,¶ 12, 68 P.3d 1015 (quoting *Desert Miriah, Inc. v. B & L Auto, Inc.*, 2000 UT 83,¶ 9, 12 P.3d 580).

■ ¶ 17 Finally, Alpha argues that the trial court incorrectly awarded TIM $3094.78 in costs incurred after making a prejudgment offer under rule 68 of the Utah Rules of Civil Procedure. *See* Utah R. Civ. P. 68(b). A court's award of costs is within its sound discretion, *see Walker v. Hansen*, 2003 UT App 237,¶ 14, 74 P.3d 635, and we review an award to determine if the trial court exceeded its permitted range of discretion, *see Morgan v. Morgan*, 795 P.2d 684, 686 (Utah Ct.App.1990).

## ANALYSIS

### I. Alpha's Breach of Contract Claims

¶ 18 Alpha contends that the trial court erred when it concluded that TIM did not breach the contract by causing material delays and failing to pay the resulting final invoice. The trial court determined that the provision regarding timing was not capable of being breached since it was ambiguous and concluded that Alpha was not entitled to contract damages. "Whether the terms of a contract are ambiguous is a question of law; this court reviews the trial court's conclusion under a correctness standard." *Anesthesiologists Assocs. of Ogden v. St. Benedict's Hosp.*, 852 P.2d 1030, 1035 (Utah Ct.App. 1993), *rev'd on other grounds*, 884 P.2d 1236 (Utah 1994).

■ ¶ 19 The trial court found that the contract terms relating to the time frames in the contract were ambiguous since they were "proposed" and indefinite. In evaluating whether a contract's plain language is ambig-

uous, we attempt to harmonize all of the contract's provisions and all of its terms. *See Central Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3,¶ 12, 40 P.3d 599; *Dixon v. Pro Image Inc.*, 1999 UT 89,¶ 14, 987 P.2d 48; *Willard Pease Oil & Gas Co. v. Pioneer Oil & Gas Co.*, 899 P.2d 766, 770 (Utah 1995). We note that the contract is not ambiguous where there is only one *reasonable* interpretation of the timing clause. *Cf. Peterson v. Sunrider Corp.*, 2002 UT 43,¶ 19, 48 P.3d 918. Although the contract included a proposed timetable and Alpha revised the time frames several times, this alone does not render the timing provision ambiguous. The contract provides that if TIM "postpones project completion for more than nine months from the date of project inception, it will be necessary [for Alpha] to submit an estimate revision for [TIM's] approval." Thus, the proposed timetable and timing provision is not ambiguous—the contract provides an exact time at which Alpha may revise the fee based on delay.

■ ¶ 20 Although we hold that the trial court erred in determining that the timing provision of the contract was ambiguous, the court's ultimate determination regarding breach is correct. The delays caused by TIM did not constitute a breach of the contract. Rather, the delays merely subjected TIM to the possibility of additional fees if Alpha submitted an estimated revision, which it did not.

■ ¶ 21 The trial court also concluded that TIM did not breach the contract by failing to pay the final invoice containing an 18% increase for TIM's delays. The court ruled that the contract did not allow Alpha to merely add a percentage without submitting a revised estimate for TIM's approval. " 'Interpretation of the terms of a contract is a question of law. Thus, we accord the trial court's legal conclusions regarding the contract no deference and review them for correctness.' " *Pack v. Case*, 2001 UT App 232,¶ 16, 30 P.3d 436 (quoting *Nova Cas. Co. v. Able Constr., Inc.*, 1999 UT 69,¶ 6, 983 P.2d 575).

¶ 22 The contract outlines the three phases of the project and provides an estimate of

fees and expenses for each component. The different component fees, when totaled, provide an estimated project total of $239,000. The contract does not provide an hourly rate nor does it provide an explanation for the various dollar amounts assigned to each component of the project. The contract anticipated that Alpha would submit a final invoice at completion of the project, and that the total fee could vary from, but was limited by, the initial estimate:

> The fees quoted here are based on an estimate of time required by [Alpha] to perform the work described as well as fair market value for these services. Fees may vary 20% above or below the estimates stated in this letter of agreement. Fees would exceed this estimate by more than 20% only if [TIM] requests expanding the scope of the project as defined here.

Hence, absent approval of a revised bid by TIM, the fee was limited to a maximum of $286,800, 20% above the original estimate. In addition, pursuant to the revisions clause, if the contract was not completed by the nine-month deadline, Alpha would be permitted to submit a revised estimate to account for the delay and to condition further performance on TIM's approval of the estimate.

¶ 23 As the project neared completion, but before the nine-month deadline expired, Alpha submitted a final invoice seeking an additional $43,000, an 18% increase of the original estimate. TIM refused to pay the invoice. Alpha maintains that the invoice was consistent with the contract terms because the fee increase did not exceed the agreed upon 20% cap. Alpha argues that it had unhindered discretion to set the final fee without further justification if the fee was within the 20% boundary provided in the contract. TIM argues that the estimate fee provision anticipated that the ultimate fee would be based on the amount and reasonable value of the work performed.[2] We agree with TIM. Interpreting the contract to permit additional

fees based solely on the whim of Alpha would be inequitable and would produce an absurd result. *See Kraatz v. Heritage Imports,* 2003 UT App 201, ¶ 28, 71 P.3d 188 (stating that "to interpret the contract so as to allow unreasonable costs and fees would reduce the costs and fees recovery provision 'to absurdity'" (quoting *Olympus Hills Shopping Ctr. v. Smith's Food & Drug Ctrs.,* 889 P.2d 445, 458 (Utah Ct.App.1994))).

¶ 24 "When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204 (1981); *see also Coulter & Smith, Ltd. v. Russell,* 966 P.2d 852, 858 (Utah 1998) (stating as settled law that "if a contract fails to specify a time of performance the law implies that it shall be done within a reasonable time under the circumstances"); *Allstate Enters., Inc. v. Heriford,* 772 P.2d 466, 468–69 (Utah Ct.App.1989) (supplying a term of reasonable duration to a contract that was silent on the duration of the agreement); *Wooldridge v. Wareing,* 120 Utah 514, 236 P.2d 341, 342 (1951) (reading implied term of reasonable compensation into an implied in fact service contract). Accordingly, we interpret the fee estimate clause to allow for additional fees based on the reasonable value of the work produced by Alpha, and we will supply a fee term that is reasonable under the circumstances.

¶ 25 In this case, the contract specifically states that fees were to be based on "an estimate of time required by Alpha ... to perform the work as described as well as fair market value for these services." What appears to be missing from the contract is any formal fee structure outlining how the total fee is to be calculated. In the absence of any

---

**2.** We note that this interpretation is consistent with other provisions in the contract. Under the revisions clause, Alpha specifically states, "Design changes ... will be billed separately at the rate of $150/hour. Editorial changes made to the Final Proof ... will be billed separately at the rate of $350/hour." Alpha did provide a base hourly rate for its services in other parts of the

contract, and thus, it was reasonable for TIM to infer that the final invoice would be billed according to similar reasonable valuations. *See* Restatement (Second) of Contracts § 203 (1981) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable.").

contract clause detailing a fee formula, we interpret the terms "time required ... to perform the work" and "fair market value" to mean reasonable fees, i.e., fees justified by time spent working or by other quantifiable means.[3]

¶ 26 The trial court found that the few extra business calls and meetings necessitated by the delay did not adequately support Alpha's additional fees. The court stated that "Alpha Partners did not spend significantly more time on the project than it originally estimated" and that "[t]here was no testimony from Alpha Partners that the actual hours spent on the project were more than originally estimated." In fact, Alpha admitted that it did not keep track of hours at all, and provided no evidence regarding what the fair market value of additional services might be.

¶ 27 Alpha argues that the additional fees were justified by TIM's delays on the project, as stated in the memo to TIM: "The delays to date ... have caused project billings to go well into the plus–20% range." The memo additionally explained that "[t]otal billings to date reflect significant down time and the need for remobilization of our team after lengthy delays, as well as the costs associated with project management over a much longer period than originally anticipated." TIM acknowledges that it was responsible for creating delays in project completion, but maintains that fees due to delays were governed by the revisions clause, not the fee estimate clause. We agree with TIM.

¶ 28 The revisions clause provided the sole mechanism by which Alpha could seek additional fees based on delays: "If [TIM] postpones project completion for more than nine months from the date of project inception, it will be necessary to submit an estimate revision for [TIM's] approval." TIM had not exceeded the contract deadline at the time the invoice was sent, nor did Alpha provide an estimate revision for TIM's approval. The delays Alpha cites as justification for the invoice do not trigger the contract terms, which specifically permitted TIM nine months to complete the project before the contract price would be affected by TIM's inaction.[4] Cf. Allen–Howe Specialties Corp., Inc. v. U.S. Constr., 611 P.2d 705, 709 (Utah 1980) ("[D]amages cannot be awarded for delays contemplated by the parties and should be controlled by the contractual remedies, unless the delays can be said to be so excessive and unreasonable as to fall outside the scope of the contract and warrant an additional recovery in quantum meruit."). This does not appear to be the case here.

¶ 29 Accordingly, we agree with the trial court that TIM did not breach the contract by causing material delays or failing to pay the final invoice. We interpret the contract to allow for additional fees based on a reasonable calculation of the work performed by Alpha. Alpha provided the court with no evidence that TIM's delays breached the contract terms, that Alpha's workload was any heavier or more costly than originally anticipated in the estimate, or that the fair market value of Alpha's services was greater than that quoted in the estimate. In the absence of such justification, TIM did not breach the contract by causing delays or by failing to pay the invoice.

¶ 30 Alpha argues in the alternative that the trial court's key findings of fact are clear-

---

3. The trial court analyzed "time worked" solely in terms of hours. Although billable hours may be the traditional way to log professional work production, we do not foreclose the possibility that Alpha could have charged more fees had it simply provided evidence of more work completed, such as additional drafts of pamphlets, documents, etc., or by any other quantifiable means. We note that the mere passage of more calendar days is not ordinarily considered "time worked," absent clear agreement of the parties. Indeed, there are instances in which costs could be incurred by the delay, such as circumstances requiring the company to maintain specialized personnel or materials that are reserved unused on an "on-call" basis, or necessary re-tooling expenses. However, without evidence of specific expenses incurred because of the delay, Alpha's invoice could not be justified based solely on the passage of time.

4. We note that, had Hecht substantiated the invoice with evidence of the total value of the work completed by her or her employees, or the value of any additional work, TIM might have been obliged to pay Alpha's claimed fee. However, the invoice did not include this information in support of the fee increase, and therefore TIM's failure to pay does not constitute a breach.

ly erroneous. Because we determine that the contract is not ambiguous, we interpret the contract as a matter of law. *See Interwest Constr. v. Palmer*, 923 P.2d 1350, 1358–59 (Utah 1996). ("If a contract is unambiguous, a trial court may interpret the contract as a matter of law, and we review the court's interpretation for correctness."). Therefore, the alleged errors are not critical to our analysis, nor has Alpha identified any factual errors that are material to the contract or our analysis. However, were we to analyze the facts for clear error, none of the contested material facts appear to lack supporting evidence, and therefore it is unlikely the trial court's factual findings would be disturbed. *See Pack v. Case*, 2001 UT App 232, ¶ 16, 30 P.3d 436.

## II. TIM's Breach of Contract and Unjust Enrichment Claim

¶ 31 TIM asserts that the trial court erred in concluding that Alpha's termination of the contract and failure to complete and deliver the marketing materials to TIM was not a breach of the contract because Alpha had substantially performed its contractual obligations. TIM further argues that it was entitled to damages since it had to hire another firm to complete the project when Alpha terminated the contract without delivering the marketing materials to TIM.

¶ 32 Alpha asserts that it substantially performed under the contract since it continued working with TIM toward completion of the project despite TIM's delays and failure to pay the additional fee of $43,000. The contract provided: "If [TIM] postpones project completion for more than nine months from the date of project inception, it will be necessary to submit an estimate revision for [TIM's] approval." The initial nine-month deadline expired on September 8, 2001, at which time TIM still had not provided Alpha with the final decision regarding the logo and tag lines necessary to complete the project. Absent a revised estimate proposed by Alpha and approved by TIM, Alpha was not entitled to charge more for delays caused by TIM or required to work past the nine-month deadline.

¶ 33 Prior to the September 8, 2001 deadline, Alpha submitted an invoice charging TIM an additional $43,000. TIM failed to pay the invoice and Alpha continued working with TIM toward completion of the project. Although Alpha continued to work on the project after the September 8, 2001 deadline it did not complete the project. TIM did not provide Alpha with its decision on the logo and tag lines prior to the deadline, making it impossible for Alpha to complete the project as originally scheduled. A dispute about the additional fee arose and Alpha terminated the contract on October 29, 2001.

¶ 34 If TIM had participated in the project in a timely manner, or given "comprehensive and timely feedback" as per the contract, Alpha may have been able to provide TIM with completed marketing materials within the nine-month deadline. TIM is not entitled to damages based on work not completed where TIM was largely responsible for that non-completion. The delays resulting from TIM's indecision on the logo and tag lines made it difficult, if not impossible, for Alpha to complete the project within the original nine-month deadline. *Cf. PDQ Lube Ctr., Inc. v. Huber*, 949 P.2d 792, 795 (Utah Ct. App.1997) ("[O]ne party may not render it difficult or impossible for the other to continue performance and then take advantage of the non-performance he has caused." (quotations and citation omitted)). Thus, the court properly determined that TIM is not entitled to damages under these circumstances.

¶ 35 TIM further alleges that the court erred in concluding that Alpha was not unjustly enriched when it kept the $225,000 fee without providing TIM with completed marketing materials. Although recovery in an action in quantum meruit, such as unjust enrichment, is typically applied in instances where no enforceable written or oral contract exists, it may be appropriate to compensate individuals who are not otherwise entitled to the benefits of a contract. *See Bailey–Allen Co. v. Kurzet*, 876 P.2d 421, 425 (Utah Ct. App.1994). "[A] non-breaching party is discharged from its contract duties but may have a quasi-contractual duty to pay the value of the benefit conferred in excess of the

damage caused by the [other party's] breach." *Id.*

¶ 36 "Three elements must be present before unjust enrichment may serve as a basis of recovery." *Concrete Prods. Co. v. Salt Lake County,* 734 P.2d 910, 911 (Utah 1987).

"[T]here must be (1) a benefit conferred on one person by another; (2) an appreciation or knowledge by the conferee of the benefit; and (3) the acceptance or retention by the conferee of the benefit under such circumstances as to make it inequitable for the conferee to retain the benefit without payment of its value."

*Id.* (alteration in original) (quoting *Berrett v. Stevens,* 690 P.2d 553, 557 (Utah 1984)). "The benefit conferred on the defendant, and not the plaintiff's detriment or the reasonable value of its services, is the measure of recovery." *Bailey–Allen Co.,* 876 P.2d at 425–26 (emphasis omitted).

¶ 37 TIM argues that Alpha received a benefit, the $225,000 fee paid in advance, that Alpha had knowledge of this benefit, and that it would be inequitable for Alpha to retain the entire fee when the project was never completed. Clearly the first two elements of unjust enrichment are present. However, we do not agree that retention of the fee by Alpha would be inequitable under the circumstances. Alpha was entitled to retain the fee for work done during the nine-month period outlined under the contract. If TIM had participated in the project in a timely manner, or given "comprehensive and timely feedback" as agreed to in the contract, Alpha may have been able to provide TIM with completed marketing materials within the contract period. Under the present circumstances, Alpha provided TIM with the nine months of marketing services that the parties contracted for, and the work performed fairly justifies the fees paid by TIM.

¶ 38 TIM is not entitled to a refund based on work not completed when TIM was responsible for that noncompletion. *Cf. Higgins v. City of Fillmore,* 639 P.2d 192, 193

(Utah 1981) ("One who causes a delay is not entitled to recover for a resulting failure to meet completion dates."). Given the trial court's "broad discretion in its application of the law of unjust enrichment to the facts of the particular case," we cannot say that the trial court erred in finding that retention of the fee was equitable where Alpha had substantially performed its obligations under the contract. *Desert Miriah, Inc. v. B & L Auto, Inc.,* 2000 UT 83, ¶ 17, 12 P.3d 580.

### III. The Trial Court's Award of Costs Under Rule 68.

¶ 39 Finally, Alpha argues that the trial court improperly awarded costs to TIM under rule 68 of the Utah Rules of Civil Procedure. *See* Utah R. Civ. P. 68. Rule 68 governs the effect of prejudgment offers on costs and attorney fees. Under rule 68(b), if the final amount awarded "is not more favorable than the offer, the offeror is not liable for costs, prejudgment interest or attorney fees incurred by the offeree after the offer, and the offeree shall pay the offeror's costs incurred after the offer." *Id.*

¶ 40 On March 19, 2004, TIM filed an offer of judgment under rule 68 that Alpha rejected. After the court submitted its final order, TIM requested the costs it incurred after the making of the offer of judgment. The affidavit in support of costs claimed $460.45 in travel expenses[5] for a witness; $1901.25 in travel expenses for Riazzi; and $733.27 for researching, copying, phone, and mailing costs incurred by TIM's counsel. The trial court reviewed TIM's request for costs and determined that the total amount claimed, $3094.78, was reasonable. Alpha argues that the costs TIM received were not properly awardable as taxable costs under rule 68. *See* Utah R. Civ. P. 54(d) (governing cost awards generally).

¶ 41 We agree with Alpha that the costs awarded by the trial court were not properly calculated. The Utah Supreme Court has determined that rule 68(b) "applies to taxable costs only." *Nelson v. Newman,* 583 P.2d 601, 604 (Utah 1978); *see also*

---

5. TIM's claimed witness travel expenses included plane tickets, parking, food during travel, rental cars, and hotel fees.

*Walker v. Hansen,* 2003 UT App 237, ¶ 24, 74 P.3d 635 (holding that in awarding costs, trial court properly considered only post-offer taxable costs as required by rule 68); *Cox v. Cox,* 877 P.2d 1262, 1270 (Utah Ct.App.1994) (recognizing the holding in *Nelson* that rule 68 applies to taxable costs only).

¶ 42 Taxable costs include filing fees, service of the complaint, jury and witness fees, deposition transcripts, and copy costs for trial exhibits. *Cf.* Utah R. Civ. P. Form 23. The Utah Supreme Court in *Frampton v. Wilson,* 605 P.2d 771, 774 (Utah 1980) limited the types of costs that are taxable:

> The generally accepted rule is that [taxable costs] means those fees which are required to be paid to the court and to witnesses, and for which the statutes authorize to be included in the judgment.
>
> There is a distinction to be understood between the legitimate and taxable "costs" and other "expenses," of litigation which may be ever so necessary, but are not properly taxable as costs.

*Id.* (footnote omitted).

¶ 43 Taxable fees for witnesses are defined under Utah Code section 78–46–28. *See* Utah Code Ann. § 78–46–28 (2002); *Armed Forces Ins. Exch. v. Harrison,* 2003 UT 14, ¶ 42, 70 P.3d 35 ("[O]nly the statutory witness fee may be taxed as costs."). Section 78–46–28 provides a detailed description of how taxable witness fees are to be calculated. The trial court in this case did not follow the statutory formula. Thus, we reverse the trial court's award of costs and remand so the trial court can make the proper calculations consistent with rule 68.

## CONCLUSION

¶ 44 The contract between Alpha and TIM, although valid, failed to describe how fees were to be calculated. We interpret the contract to permit the charging of fees exceeding the initial estimate based on the reasonable value of the work performed. Because Alpha did not provide the court with any evidence illustrating that the value of its work was worth more than the amount quoted in the original estimate, TIM did not breach the contract by failing to pay the

$43,000. Furthermore, Alpha was not required to perform past the original nine-month deadline outlined in the contract, and its termination of the contract after the deadline was not a breach. Alpha substantially performed its obligations under the contract and was not unjustly enriched under the present circumstances by retaining the amount already paid by TIM. Finally, the trial court erred in awarding as costs items that fell outside the limited definition of taxable costs under rule 68.

¶ 45 We affirm the trial court's decision with the exception of the taxable costs award. We remand to the trial court to determine the appropriate taxable costs due to TIM.

¶ 46 I CONCUR: PAMELA T. GREENWOOD, Associate Presiding Judge.

¶ 47 I CONCUR IN THE RESULT: JAMES Z. DAVIS, Judge.